**Willie ROSARIO, Petitioner,**

v.

**Robert KUHLMAN, Superintendent of Sullivan Correctional Facility, Respondent.**

**No. 86 Civ. 5593 (WK).**

United States District Court, S.D. New York.

April 21, 1987.

---

Janet Claire Le, Philip L. Weinstein, The Legal Aid Society, New York City, for petitioner.

Lisa Margaret Smith, Melissa Harrison, Dist. Atty., King's County, Brooklyn, N.Y., for respondent.

WHITMAN KNAPP, District Judge.

Willie Rosario petitions this Court for a writ of *habeas corpus* pursuant to 28 U.S.C. §§ 2241 and 2254. He claims that the trial court's refusal to permit introduction of the perpetuated testimony of his sole witness, a young woman who had testified at the previous trial of a co-defendant, violated his constitutional rights. Respondent seeks dismissal of the petition for failure to raise a federal constitutional claim or, in the alternative, because the testimony in question was collateral and not material.

## INTRODUCTION

The fact pattern presented by this petition is, to say the least, unique. Two defendants—petitioner and one Rafael Cruz—accused of participating in a murder, were separately tried. The only identifying witness against them was one Victor Cartagena, himself a criminal who—as was suggested at petitioner's trial (T2. 210) [1]—might have been a participant in, rather than a witness to, the murder. The testimony at the two trials was substantially identical (apart from some fingerprint evidence applicable only to Cruz), except that the testimony of one Irma Coreano was admitted at Cruz's trial but excluded at petitioner's. Coreano's testimony tended to cast doubt on Cartagena's veraci-

---

1. As will be explained, the petitioner had a second trial after an earlier conviction had been reversed. T1. refers to the transcript of the first trial. T2. refers to the transcript of the second.

ty. Cruz was acquitted, while petitioner was convicted. The question before us is: Did the ruling excluding Coreano's testimony violate any right guaranteed to petitioner by the United States Constitution?

## FACTS

At 6:15 on the evening of October 12, 1974 two men entered the Jimenez Grocery Store on Graham Avenue in Brooklyn and announced a holdup. Louis Camacho, a boy who was working behind the counter, heard the men but did not see them well enough to identify them before he was shot and lost consciousness (T1. 26–37, 46–47, 50, 52–53). When he recovered consciousness he saw the store owner, Julio Jimenez, run from the store clutching his chest (T1. 470). A bullet had entered his neck and exited his chest. Jimenez later died of his wounds (T2. 13, 16–18). The crime was not immediately solved.

Approximately a month later Victor Cartagena—who had recently served time for a robbery in the course of which a man had been shot in the neck (T2. 112, 124–5)—was arrested for another robbery unrelated to the one here involved. Seeking to make a bargain with the police in order to avoid formal criminal charges for the robbery for which he had just been arrested, Cartagena told the arresting officer that he had witnessed the October 12 robbery/murder on Graham Avenue and knew the culprits (T2. 95, 103–104, 114–115). Cartagena was indicted for the unrelated robbery anyway, but was able to exchange his cooperation in the instant case for a 1½ to 3 year sentence to run concurrently with another 1½ to 3 year sentence for attempted possession of a gun.

In May, 1975 Police Officer Frederick Nelson spoke to Cartegena at Riker's Island about the Graham Avenue crime (T2. 19, 24, 30). On June 2, 1985 Cartagena was brought to the Brooklyn District Attorney's Office and there reached an agreement with a member of that office. The

information Cartagena provided to Nelson and to the Brooklyn D.A. led to the arrest of petitioner and Rafael Cruz.

On May 6, 1976 petitioner and Cruz went on trial together. The People's key witness—indeed the only witness who claimed to have seen the defendants commit the crime—was Cartagena. No one else identified either defendant.[2] The People also introduced into evidence an unredacted confession purportedly made by Cruz which implicated petitioner.[3] Both men were convicted.

The Appellate Division, Second Department, reversed petitioner's conviction under authority of *Bruton v. United States* (1968) 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, ruling that the trial court had improperly admitted Cruz's confession into evidence against petitioner at the joint trial. A new trial was ordered. *People v. Rosario* (2nd Dept.1979) 70 A.D.2d 956, 417 N.Y.S.2d 767, *aff'd* (1980) 51 N.Y.2d 889, 434 N.Y.S.2d 973, 415 N.E.2d 962. The Appellate Division also reversed Cruz's conviction. It ruled that his confession had been obtained in violation of his Sixth Amendment right to counsel, suppressed the confession and ordered a new trial. *People v. Cruz* (2nd Dept.1979) 72 A.D.2d 549, 420 N.Y.S.2d 721.

While the People were appealing petitioner's case to the New York Court of Appeals, Cruz was tried again. Cartagena having in the meantime died of gunshot wounds unrelated to this case, his testimony from the original joint trial was read into evidence. The defense called a young woman named Irma Coreano, whose testimony suggested that Cartagena's identification testimony had been untruthful. Cruz was acquitted.

On June 8, 1981 petitioner's second trial began. Again the People read into the record Cartagena's perpetuated testimony. The defense made extensive efforts (detailed later in this opinion) to locate Irma

---

**2.** Cruz, however, was connected to the crime scene by another piece of evidence. During his initial investigation Detective Nelson had discovered latent fingerprints in fresh paint on the windowsill of a vacant apartment on Meserole Street. Cartagena testified that he saw Cruz flee

towards Meserole Street. The latent print on the windowsill turned out to belong to Cruz. No prints of petitioner were found.

**3.** Cruz denied having made the confession.

Coreano. After those efforts had failed, the defense sought the court's permission to offer Coreano's testimony from the prior trial, at which she had been cross-examined by the same Assistant District Attorney handling the case against petitioner. The court denied that application, ruling that the defense had failed adequately to demonstrate Coreano's "unavailability" under New York Criminal Procedure Law ("CPL") § 670.10. Petitioner was convicted of murder in the second degree and two counts of criminal possession of a weapon in the second degree and sentenced to concurrent terms of imprisonment of 20 years to life and 0 to 15 years (twice).[4]

The Appellate Division, Second Department, affirmed the conviction without opinion and leave to appeal to the Court of Appeals was denied.

### 1. Cartagena's Testimony

Cartagena testified that on the evening of the robbery he was standing on Graham Avenue outside the Jimenez grocery store in the company of his girlfriend Eva Lopez, with whom he claimed to have been sharing a furnished room in the neighborhood (T2. 98–100). A car drove up with three people whom he recognized: Cruz (who was married to Cartagena's cousin); petitioner; and a young man named "Jimmo," who was driving (T2. 83–84, 141–142). Petitioner and Cruz emerged from the car. Cartagena did not speak to them.

He saw Cruz and petitioner enter the grocery store. He then went over to the store's window and looked in. Lopez was "not very far behind me" (T2. 98). He saw petitioner and Cruz standing with guns

drawn in front of the cash register. An older man and a boy stood behind the counter. Petitioner then shot the proprietor and Cruz shot the boy. After being shot the older man held his stomach (T2. 87–88). Petitioner then fled toward Montrose street, while Cruz fled in the opposite direction toward Meserole street. Subsequently Cartagena had conversations with both Cruz and petitioner concerning the crime (T2. 90–93).

### 2. Coreano's testimony

At Cruz's second trial Coreano testified that she was then a student in her second year at Brooklyn Law School. She was Cruz's sister-in-law and Cartagena's cousin. In November of 1974 (about a month after the murder) she met Eva Lopez and two weeks later they became roommates. In early 1975 (at least two and a half months after the murder, and while Coreano and Lopez were still roommates) Coreano introduced Lopez to Cartagena. The two had never met before.[5] Subsequently Lopez and Cartagena began dating.

### 3. Lopez's recollection

Eva Lopez was not called as a witness. A detective testified that she had said that she could not remember whether in Cartagena's company she had witnessed a robbery and homocide in October of 1974 (T2. 42–43, 193–195).

### 4. Petitioner's efforts to locate Coreano

By motion returnable May 22, 1981, petitioner moved the trial court for an order pursuant to CPL § 670.10 permitting intro-

---

**4.** Prior to the second trial, at which point petitioner had already been incarcerated for six years, he was offered a plea bargain which would have been tantamount to time served (Sentence Transcript at p. 8). He subsequently explained his rejection of that offer as follows (*Id.* at 10):

> He [the prosecutor] suggested time served. For a man that's guilty time served is beautiful. But if I didn't commit it why should I label myself a murderer if I didn't commit the crime.

**5.** Respondent claims that this fact is not established by—but can only be inferred from—Coreano's testimony, in that she could not have

had personal knowledge of the previous life experiences of Cartagena and Lopez. However, at Cruz's trial Coreano's unequivocal testimony that "they hadn't met until I introduced them," was admitted in evidence. (Transcript of April 23, 1980, p. 8). Had it then been excluded as inferential or conclusory, the accuracy of the conclusion could easily have been established by detailed testimony as to what Cartagena and Lopez had said to each other and how they had said it at the time of their introduction by Coreano. In leaving undisturbed Coreano's unequivocal testimony that "they hadn't met until I introduced them", the trial court probably reasoned that it was avoiding an unnecessary waste of time.

duction of Coreano's prior testimony.[6] The ground for the motion was that Coreano could not with due diligence be found. Affidavits of defense counsel and of a defense investigator, Ralph L. Addonizio, as well as a transcript of Coreano's prior testimony were included in the motion papers.

Those papers established that the investigator, Addonizio, had made the following efforts to locate Coreano:

On May 5, 1981 he had gone to her former residence at 139 South 1st Street in Brooklyn, but she was not there. He left a message with a neighbor, Ada Gonzalez. Two days later he returned and Gonzalez told him that Coreano had received the message on a visit to the building, but had moved to Manhattan and that her husband did not want her to get involved in any further court proceedings.

Addonizio then visited a supermarket on South 1st Street where she had formerly been employed and was informed by the manager that she no longer worked there. None of the employees of the store acknowledged to Addonizio that they knew Coreano.

On May 7, 8, and 11 he tried to contact Coreano's sister, but no one answered his knocks on the door.

He attempted to contact the Bureau of Motor Vehicles in Albany, with no results.

He checked at the local post office for a change of address, and learned that none was on file.

Between May 5 and May 11 he canvassed people in the area and in neighborhood buildings, but was unable to glean any information about Coreano or her whereabouts.

He went to Brooklyn Law School, and was told that students' records are considered confidential.

The court denied the motion.

On June 2 Addonizio finally located Coreano at an address provided by the District Attorney's office, and served her with a subpoena returnable June 8. She did not respond to the subpoena.

On June 9 petitioner moved to have Coreano adjudged as a material witness or in the alternative that a warrant for her arrest as a material witness be issued pursuant to CPL § 620.20. That motion was granted in part, and the Judge signed an arrest warrant directing that Coreano be brought before the court to commence "a proceeding to determine whether or not [she should] be adjudged a material witness." (Order of June 10, 1981, Justice Domenic Lodato.)

The warrant was turned over to the New York City Police Department, and the police looked for Coreano on three days. First, officers from the 90th Precinct in Manhattan went to a place known as Unacres Sunshine Houses and then to another Manhattan address where Coreano was supposed to live. On both occasions they failed to find her. Then detectives from the Brooklyn Detective Task Force, in the words of the Assistant District Attorney, "spent a considerable amount of time looking for [Coreano]." They, too, failed to find her (T2. 51, 175–176, 178–179).

At the close of the People's case, petitioner renewed his motion to introduce Coreano's perpetuated testimony, noting that Coreano had previously been cross-examined by the very prosecutor who was trying this case (T2. 176–177). It will be remembered that Cartagena had apparently tried to explain his presence at the scene of the crime by claiming that he and Lopez had been living together in the neighborhood of the crime, and that they had together witnessed the murder. Petitioner's purpose in offering Coreano's testimony was to establish that Lopez and Cartegena had not even met each other at the time in question, and that his attempt to use Lopez in order to explain his presence at the scene of the crime was therefore perjurious. Coreano was petitioner's only witness, since his de-

---

**6.** CPL § 670.10 provides:

    1. .... testimony given by a witness at (a) a trial of an accusatory instrument ... may, where otherwise admissible, be received into evidence at a subsequent proceeding in or relating to the action involved when at the time of such subsequent proceeding the witness.... cannot with due diligence be found....

fense rested solely on an attack upon Cartagena's credibility.[7]

The trial court denied the renewed motion, but did not articulate the reasons for its decision. However, it offered no criticism of *petitioner's* efforts to locate Coreano, but seemed critical of the *detectives'* apparently lackadaisical response to the court's directive to produce her. Thus, it observed that these detectives had "just sent a squad car out there and never really checked to see if she was living there. Just that nobody was home at the time" (T2. 178).

On the apparent basis of these observations, the trial court decided that *petitioner* had failed to demonstrate a good faith effort to produce the witness (T2. 178).

Petitioner's conviction was affirmed without opinion by the Appellate Division and leave to appeal to the Court of Appeals was denied. This petition followed.[8]

## DISCUSSION

It is axiomatic that the defendant in a criminal case is constitutionally entitled to have the court accept in evidence any proffered testimony which is both admissible and vital to his defense. *See e.g. Chambers v. Mississippi* (1973) 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297, *Washington v. Texas* (1967) 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019; *In Re Oliver* (1948) 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682.

It follows that two questions are presented by this petition:

(1) Was Coreano's proffered testimony essential to petitioner's defense, i.e. was it material as a matter of constitutional law?

(2) Was it admissible, i.e. had petitioner met the constitutional requirements for offering prior testimony of a witness claimed to be unavailable?

1. Materiality As a Matter of Constitutional Law

Respondent seeks to defend the exclusion of Coreano's testimony on two grounds: First, that it was not "material" whether or not Lopez and Cartagena had known each other at the time of the murder. Second, that even without Coreano's testimony petitioner was able to ask the jury to find that the two had not in fact known each other on the basis of the detective's testimony that Lopez had said she could not "remember" whether she and Cartagena had together witnessed the murder. Neither contention has merit.

As to the first contention we find it simply frivolous to attribute immateriality to testimony which would have entitled the jury to find that the only identifying witness (an habitual criminal who was himself a possible suspect) had resorted to perjury to explain his presence at the scene of the crime. We also note, in passing, that the materiality of the testimony as a matter of New York Law was established by the court's action in allowing it in evidence at Cruz's trial, where it apparently had the effect of bringing about the defendant's acquittal.

The second contention is disposed of by *Chambers v. Mississippi, supra,* 410 U.S. at 289, 294, 93 S.Ct. at 1042, 1045. In that case Chambers had been convicted of murdering a policeman. He had been prevented by state evidentiary rules from (1) cross-examining a witness named McDonald who had confessed to the murder for which petitioner was being tried and had later repudiated that confession; and from (2) introducing the testimony of three witnesses to whom McDonald had also confessed the killing, and who would have presented other evidence discrediting McDonald's repudiation and independently tending to establish his culpability for the crime for

---

7. We were at first impressed with respondent's argument that petitioner should be faulted for not having called Lopez (Respondent's brief pp. 3–4). On reconsideration, there is no evidence in the record that Lopez was still alive at the time of the second trial, let alone that she was available and could have been persuaded to testify.

8. The Constitutional question was specifically presented to the Appellate Division (pp. 28–30 of petitioner's brief to that Court), and respondent does not suggest failure to exhaust state remedies.

which Chambers was being tried. The state argued that the excluded testimony had not been essential because, since one of McDonald's confessions was actually before the jury, exclusion of the proffered testimony had not deprived Chambers of the opportunity of arguing that it had been McDonald and not he who had been guilty of the crime on trial. But this was not found to be sufficient to satisfy Due Process. The Court ruled that the conviction was constitutionally infirm because "Chambers' defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the [three] other confessions been admitted." 410 U.S. at 294, 93 S.Ct. at 1045.

■ So here, respondent cannot defend the exclusion of material testimony by arguing that other (and in this case more tenuous) evidence was available to petitioner.

### 2. Petitioner's Compliance With Constitutional Requirements for Admission of Prior Testimony

The standard for permissible use of prior testimony at a criminal trial was set forth by the Supreme Court in *Ohio v. Roberts* (1980) 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597. The Court there considered two factors in evaluating the propriety of introducing prior testimony in a criminal trial: reliability and the unavailability of the witness. 448 U.S. at 68, 73–74, 100 S.Ct. at 2540, 2542–43.

### A. Reliability

■ As to the question of reliability, prior trial testimony where the same party has had a full and fair opportunity to cross-examine the witness is the most reliable form of such testimony. *See Roberts, supra,* 488 U.S. at 68, 100 S.Ct. at 2540. Here, we are dealing not only with a prior trial where the same party had a full and fair opportunity to cross-examine, but to one where that party was represented by the very same lawyer now objecting to the use of the testimony. There can be no doubt, therefore, that Coreano's prior testimony satisfies the reliability prong of the *Roberts* test.

### B. Unavailability

Most cases dealing with the problem of what must be shown to establish that a missing witness is sufficiently "unavailable" to warrant the use of prior testimony deal with situations where the prosecutor seeks to introduce such testimony in contravention of a defendant's Sixth Amendment rights. *See e.g. Roberts supra; Mancusi v. Stubbs* (1972) 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293; *Barber v. Page* (1962) 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255; *Mechler v. Procunier* (5th Cir.1985) 754 F.2d 1294; *United States v. Sindona* (2nd Cir.1980) 636 F.2d 792, *cert. denied* (1981) 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302; *Glenn v. Dallman* (6th Cir.1980) 635 F.2d 1183, *cert. denied* (1981) 454 U.S. 843, 102 S.Ct. 155, 70 L.Ed.2d 128, *rev'd on other grounds,* (8th Cir.1982) 686 F.2d 418. *See also People v. Arroyo* (1982) 54 N.Y.2d 567, 446 N.Y.S.2d 910, 431 N.E.2d 271, *cert. denied* 456 U.S. 979, 102 S.Ct. 2248, 72 L.Ed.2d 855. Those cases teach that a prosecutor need only show that he, in good faith, made reasonable efforts to produce the absent witness. No one has suggested—and indeed it could not be suggested—that a defendant has a greater burden when he is trying to assert his Constitutional rights than does the Government when it tries to overcome them.

■ In this state of the law, the respondent's contention that petitioner did not establish the unavailability of the witness need not long detain us. We have already noted that the trial Judge never offered the slightest criticism of *petitioner's* efforts in this regard. Respondent has not—to this very day—come up with a suggestion of what more an impecunious (or even a wealthy) defendant could have done to produce the witness. Indeed, by issuing a warrant for the witness's arrest and directing the New York City Police Department to bring her before the court, the trial Judge implicitly ruled that petitioner had done all that could reasonably be expected of him. The trial Judge did not articulate the theory on which he seemed to find that

the Department's subsequent failure to effectuate the court's order could be held against the petitioner. We can conceive of no such theory.

 In brief, the trial court's exclusion of prior relevant testimony on the ground that the witness's absence had not adequately been accounted for cannot be justified on any theory whatsoever. The writ must therefore be sustained.[9]

We cannot end this opinion without recognizing the extraordinarily competent advocacy of petitioner's *pro bono* counsel, Janet Claire Le, Esq. Her services, in effect, vindicate the philosophy behind the decision in *Gideon v. Wainwright* (1963) 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799. As the records of our Clerk's office will indicate, when this petition was first submitted for our consideration Ms. Le's brief had been misfiled and did not come to our attention. In a Memorandum which has since been withdrawn (but is still on file) we dismissed the petition. Without the benefit of her advocacy we had not grasped the full significance of the excluded testimony or of the trial court's apparent error in holding the petitioner responsible for the Police Department's misfeasance.

### CONCLUSION

The exclusion of Coreano's testimony denied petitioner the right to present highly relevant and probative evidence in violation of the Sixth and Fourteenth Amendments to the Constitution. Accordingly, the writ of *habeas corpus* is granted and the state

is directed to release petitioner unless it affords him a new trial within 120 days.[10]

SO ORDERED.

**9.** We do not, of course, suggest that the trial court had been under any constitutional duty to issue its warrant and direct the Police Department to produce the witness. Indeed, it seems obvious that the court could, in the exercise of its discretion, have denied petitioner's application for a warrant and required him to conduct his defense on the basis of Coreano's previously recorded testimony. We hold only that, having exercised its discretion to invoke the state police power on petitioner's behalf, it cannot then hold petitioner responsible for subsequent dereliction of duty by the police officers.

**10.** Should the People elect to re-try petitioner, it is hoped that Ms. Le will find it possible to

continue representing him. At such a trial it well might be that the New York City Police Department could be prevailed upon actually to produce in court the reluctant Coreano. (*But Cf.* footnote 9, *supra*) Also, it might be established by testimony of the hitherto uncalled Lopez—assuming she is still available and that she could be confronted with live testimony of her former roommate—that her inability to "remember" whether she and her boyfriend had together witnessed a murder in October of 1974 arose from the circumstances that they had not even met each other until early in 1975.