Willie ROSARIO, Plaintiff–Appellee,

v.

Robert KUHLMAN, Superintendent,
Sullivan Correctional Facility,
Defendant–Appellant.

No. 235, Docket 87–2209.

United States Court of Appeals,
Second Circuit.

Argued Oct. 8, 1987.

Decided Feb. 12, 1988.

Janet Claire Le, The Legal Aid Soc., New York City (Michael Gross, Philip L. Weinstein, of counsel) for plaintiff-appellee.

Melissa Harrison, Asst. Dist. Atty., Kings County, Brooklyn, N.Y. (Elizabeth Holtzman, Dist. Atty., Kings County, Brooklyn, N.Y., Barbara D. Underwood, Peter A. Weinstein, Asst. Dist. Attys., of counsel) for defendant-appellant.

Before KAUFMAN and ALTIMARI, Circuit Judges, and TENNEY,* District Judge.

* The Honorable Charles H. Tenney, United States Senior District Judge for the Southern District of New York, sitting by designation.

TENNEY, District Judge:

At about 6:15 in the evening of October 12, 1974 two men held up the Jiminez grocery store at 161 Graham Avenue between Messerole and Montrose Streets in the Williamsburg section of Brooklyn, New York City. At the time the men entered the store the proprietor Julio Jiminez was standing before the cash register, and his helper Louis Camacho, a 12 year old boy, was close by, stooped behind the counter preparing shopping bags for the two or three customers present in the store. Camacho heard the men announce that it was a hold up and when Camacho started to stand up shots were fired. Camacho was shot over the left eye but not seriously wounded, and when he recovered moments later saw Jiminez, clutching his chest, run from the store. Camacho followed Jiminez out of the store where the latter collapsed on the sidewalk. Jiminez later died in a hospital from a gunshot wound in the neck.

Early the following morning a detective assigned to investigate the robbery-homicide responded to a call of an attempted break-in at 148 Messerole Street around the corner from the scene of the holdup. He observed that a ladder had been placed up to the window of a vacant second floor apartment in an apparent attempt to enter the building from the roof of a furniture store below. A latent fingerprint was removed from the freshly painted windowsill by a police forensic unit.

On October 20, 1974, eight days after the Jiminez homicide, Victor Cartagena was arrested for an unrelated robbery and, wanting "to make a bargain" and avoid the arrest, told the arresting officer that he had witnessed and could identify the men involved in the Jiminez robbery-homicide. The attempt to avoid arrest did not succeed. Cartagena was indicted for robbery in the first degree and was confined to jail in Brooklyn until he made bail in January or February 1975.

This was not Cartagena's first encounter with New York's system of justice. Cart-

agena had been convicted of robbery in the second degree in 1969 and sentenced to seven years in prison. He had been released on parole after serving approximately five years. On April 13, 1975 he was arrested in Manhattan for possession of a weapon. Cartagena had unsuccessfully attempted to avoid arrest for gun possession. He explained such possession by the claim that he had been the victim of a hold up shortly before but had disarmed his assailant. He was convicted and sentenced to 1½ to 3 years in prison.

While incarcerated on Rikers Island Cartagena became worried because a warrant had been issued for his failure to appear in Brooklyn on the October 1974 robbery indictment. Sometime in the spring of 1975 he received a visit from a detective investigating the Graham Avenue robbery-homicide, who inquired whether Cartagena had talked about that homicide to the Brooklyn police after his arrest for robbery in October or November 1974. After hearing Cartagena's story, a meeting was arranged with an Assistant District Attorney in Brooklyn and on June 2, 1975 Cartagena bargained for a plea conditioned on his cooperation. The Assistant District Attorney agreed to allow him to plead to an E felony and to recommend a sentence of 1½ to 3 years on the first degree robbery indictment to run concurrently with the 1½ to 3 year sentence he was serving on the gun possession conviction, compared to a 12½ to 25 year sentence he could receive under the first degree robbery indictment. This bargain was to be in exchange for Cartagena's cooperation in the Jiminez murder case.

On the basis of Cartagena's information Willie Rosario and Rafael Cruz were thereafter indicted and went to trial on May 6, 1976. There was only one identifying witness, Cartagena, who claimed that he had seen the two men commit the robbery-homicide. Cartagena testified that he was with his girlfriend, Eva Lopez, and another woman named Maria when he observed the robbery-homicide. Rosario and Cruz were found guilty of murder in the second degree and of two counts of criminal possession of a weapon in the second degree, and sentenced to concurrent terms of imprisonment of 20 years to life on the murder count and 0 to 15 years on each of the possession counts. On June 25, 1979, the Appellate Division, Second Department, reversed Rosario's conviction on *Bruton* grounds [1] and ordered a new trial. *People v. Rosario,* 70 A.D.2d 956, 417 N.Y.S.2d 767 (2d Dep't 1979), *aff'd,* 51 N.Y.2d 889, 434 N.Y.S.2d 973, 415 N.E.2d 962 (1980). The basis for the reversal was that the state had introduced into evidence at the trial an unredacted confession, purportedly made by Cruz, implicating Rosario. The same court also reversed Cruz's conviction on the ground that his postindictment confession had been obtained in violation of his right to counsel, and it suppressed the confession and ordered a new trial. Thus the jury had the benefit of Cartagena's testimony that he had witnessed the crime while he was with his girlfriend, Eva Lopez, and her friend Maria. *People v. Cruz,* 72 A.D.2d 549, 420 N.Y.S.2d 721 (2d Dep't 1979).

The second trial of Cruz commenced in April 1980, over four years after the original joint trial. Rosario could not be tried at that time as his appeal was pending before the New York Court of Appeals. In the meantime Cartagena had died of gunshot wounds in an unrelated matter. The state introduced into evidence his perpetuated testimony from the joint trial. The defense called a young woman named Irma Coreano to impeach Cartagena's prior testimony. Coreano testified that Cartagena did not meet Lopez until some months later. Cruz was acquitted.

In June 1981 Rosario went to trial. As in the prior Cruz trial the perpetuated testimony of Cartagena was received in evidence. This was the sole identification evidence against Rosario. However, when the defense asked that Coreano's impeaching testimony at the Cruz trial be received in evidence, the court refused on the ground that the defense had not made a diligent effort to locate Coreano under the provi-

---

1. *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

sions of N.Y.Crim.Proc.Law § 670.10 (McKinney 1984).[2]

The defense rested without introducing any evidence. Rosario was convicted and sentenced on July 23, 1981 to concurrent terms of 20 years to life for murder and 0 to 15 years for possession of a weapon.

Rosario appealed his conviction to the Appellate Division, Second Department on the grounds that the trial court's refusal to receive in evidence the perpetuated testimony of Coreano had deprived him of his due process rights to a fair trial and to present a defense. U.S. Const., amends. VI, XIV; N.Y. Const., art. 1, § 6. The state in its brief argued that: (1) the defense had not demonstrated a good faith effort to locate Coreano; (2) Coreano's testimony dealt with the credibility of Cartagena on a collateral matter; (3) the exclusion of Coreano's testimony did not preclude the defense from proving that Lopez was not with Cartagena on the night of the murder; (4) Coreano's testimony was equivocal and "suspect"; and (5) the defense should have called Lopez as a witness.

The Appellate Division affirmed Rosario's conviction without opinion on December 5, 1983. *People v. Rosario*, 98 A.D.2d 998, 469 N.Y.S.2d 831 (2d Dep't 1983). The New York Court of Appeals denied leave to appeal on March 21, 1984. *People v. Rosario*, 62 N.Y.2d 623, 476 N.Y.S.2d 1037, 464 N.E.2d 496 (1984).

Rosario filed a petition for a writ of *habeas corpus* in the district court arguing, as he had in the state courts, that the trial court's refusal to admit Coreano's testimony into evidence had deprived him of his due process rights to present a defense and to have a fair trial. Again the state raised the same arguments as it had in the state courts while conceding that Rosario had exhausted his claim in the state courts. The state further argued that no federal question was presented and that if there was error, it was harmless.

The district court granted the writ on April 21, 1987. 658 F.Supp. 1408. It dismissed the state's argument that the defense had failed to demonstrate a good faith effort to locate Coreano. *Id.* Furthermore, it held that Coreano's testimony was material as a constitutional matter and termed the state's argument that it was immaterial as "simply frivolous," *id.* at 1413, holding further that the materiality of the testimony had been established by its admission into evidence in the trial of Cruz. The district court also rejected the argument that the defense was able to put before the jury the question of Lopez's presence at the scene of the crime and noted that there was no evidence in the record to indicate that Lopez was available as a witness at Rosario's trial. *Id.* at 1415.

The district court concluded that the exclusion of Coreano's testimony denied Rosario the right to present "highly relevant and probative evidence in violation of the Sixth and Fourteenth Amendments to the Constitution." *Id.* at 1415.

Before discussing the legal implications of this case we turn to the testimony of Cartagena admitted into evidence in the original joint trial of Rosario and Cruz, and received in perpetuated form in the subsequent individual trials of Cruz and Rosario. We shall also consider the testimony of Coreano which was admitted into evidence in the Cruz trial but was not received in perpetuated form in the trial of Rosario. And we shall also consider the pertinent testimony of a police officer, Frederick R. Nelson, in the instant case.

### The Testimony of Cartagena

Cartagena testified that he was at the scene of the robbery-homicide at the Jiminez grocery store on October 12, 1974 because he had gone to a TV store located one store away from the grocery store on Graham Avenue between Messerole and Montrose streets in Brooklyn. That al-

2. N.Y.Crim.Proc.Law § 670.10(1) provides in pertinent part:
   [T]estimony given by a witness at ... a trial of an accusatory instrument ... may ... be received into evidence at a subsequent proceeding in or relating to the action involved when at the time of such subsequent proceeding the witness ... cannot with due diligence be found....

though he resided at 890 East Sixth Street in Manhattan, "a borough away" from the location of the grocery store, he was sharing an apartment with Eva Lopez on South Second Street and Broadway, about four or five blocks from the site of the crime. That prior to this Lopez had been living with Cartagena's cousin at 139 South First Street. The TV set in Lopez's apartment needed a tube and he, Lopez, and a young friend of Lopez's named Maria had gone to a TV store on Graham Avenue with which he was familiar. Although Cartagena testified that he actually went into the TV store, leaving Lopez and Maria outside, it is not clear when this occurred, and he admitted he never obtained the TV tube. He testified he was about to enter the TV store when the car drove up with Cruz and Rosario.

In any event, Cartagena stated that he, Lopez and Maria had been in the immediate vicinity of the grocery store for 20 to 25 minutes "looking at stores" (although Cartagena could only identify one other store on that block). While standing outside the TV store, they observed a yellow Pontiac with a man (known to Cartagena as Jimmo) at the wheel, and Cruz and Rosario in the rear seat, drive up and continue around the block. Cartagena had known Cruz for about two years as Cruz was married to Cartagena's cousin. He also had known Rosario for about one or two months.

He testified that when the car returned it stopped, and Cruz and Rosario got out of the car and headed toward the grocery store passing within 15 feet of Cartagena, Lopez and Maria. According to Cartagena no words were exchanged. Cartagena testified that he left Lopez and Maria in front of the TV store and went to the grocery store window, on the right as viewed from the street, and that he could observe Rosario and Cruz standing in front of the counter. The counter ran lengthwise along the right side of the store so that Cartagena had only a side view of the victims and of Rosario and Cruz. He testified that Jiminez, the owner, was behind the cash register on the counter and next to him was the boy. Rosario was next to Cruz but nearer the front door, and Jiminez and the boy were a few feet apart with the boy nearer the front door. Cartagena testified that there were three other people in the store, one of whom, a man, was in the rear. Cartagena saw Rosario shoot Jiminez, and also saw the boy shot by Cruz as the boy lunged past Jiminez for protection. Jiminez, when he was shot, held his stomach. Cartagena then saw Rosario and Cruz run out of the store, Rosario heading toward Montrose Street and Cruz in the opposite direction toward Messerole Street. Cartagena gave two versions of what happened after the shooting. In one, he went to the corner "to observe Mr. Cruz running away." In the other, he continued to watch through the window as people came into the store and others joined him at the window. According to Cartagena, he watched through the window for four or five minutes and Cruz and Rosario were in the store for three or four minutes. He also testified he helped the boy's mother place the wounded boy, Camacho, in an ambulance.

Cartagena said he talked with Lopez about the incident later that day and that it was "a thing that you don't forget very easily." Although many police came to the scene, Cartagena admitted he had never identified himself as a witness or talked with any of them.

Cartagena testified that the following day he met Cruz and Rosario at a parking lot and garage on the corner of South First and Bedford Streets. He testified that Cruz was covered with soot. According to Cartagena, Rosario told Cruz that if he and Rosario were apprehended for the homicide it would be because Cruz didn't kill the boy. He further testified that this same conversation between Rosario and Cruz occurred again three days later at a party in the same neighborhood.

### The Testimony of Irma Coreano

On April 23, 1980 Coreano testified as a defense witness at the trial of Cruz. It was this perpetuated testimony that the trial court refused to receive in evidence in the instant case.

Coreano testified that she had resided at 139 South First Street, Brooklyn for over 20 years and was presently completing her second year at Brooklyn Law School. She testified that she had known Victor Cartagena for 28 years since he was her first cousin. She had not met Eva Lopez until November 1974. Lopez was then working as a barmaid in a bar owned by Coreano's brother-in-law at 53rd Street and Third Avenue, Brooklyn. Two weeks after they met Lopez came to live with Coreano. Lopez did not know Cartagena at that time since he was in prison and did not get out until January or February 1975. When Cartagena was released from prison and came to see Coreano, Lopez was there at the time and Coreano introduced her to Cartagena. Although Cartagena was married at the time, he started dating Lopez some time after January 1975. Coreano knew Cruz because he was married to her sister. Coreano knew about the robbery-homicide and was aware that the date was October 12, 1974. She did not know where Cartagena was on that date. She also testified that she knew when Cartagena was in jail because she lived next door to Cartagena's mother, who told Coreano when she went to see Cartagena in jail.

### Testimony of Police Officer Frederick Nelson

Frederick Nelson was a veteran police officer—a homicide detective—who was involved in the investigation of the Graham Avenue homicide from its inception. He had interrogated witnesses at the scene, had investigated the break-in on Messerole Street where a fingerprint was discovered, and had gone to Rikers Island in late May 1975 and interviewed Cartagena. He testified that none of the witnesses to the crime except Cartagena could identify Rosario as a participant in the crime, although Nelson interviewed them and showed them photographs of Rosario. He also testified that no fingerprints or other identifying evidence was found in the grocery store. Nel-

son testified that after the interview at Rikers Island the print found on Messerole Street was identified as Cruz's. Nelson also testified that he had never seen or heard of Cartagena prior to visiting him at Rikers Island.

Nelson did not testify with his original notes of the interview but utilized DD–5 forms prepared from his notes. He testified that Cartagena told him at the first interview that he was in the TV shop when the shots were fired. However, this was not reflected in the DD–5 forms and at the same interview Cartagena had said he saw the shooting. Nelson did not recall whether Cartagena mentioned Lopez at the first interview at Rikers Island. He testified that another police officer subsequently told him that he had located Lopez and that she could not recall whether she was with Cartagena on the day of the crime. Nelson also testified that Cartagena never said Jiminez was shot in the stomach but that he was shot in the neck. A few days after the interview at Rikers Island, Nelson brought Cartagena to the Kings County District Attorney's Office where Cartagena agreed to cooperate in the prosecution of Rosario and Cruz.

### DISCUSSION

■ We do not dwell at any length on the defense's attempts to locate Coreano or on the trial court's finding that Coreano was not unavailable. As the district court observed, the trial court, in effect, penalized the defense after the defense had successfully served Coreano with a subpoena prior to the trial. Coreano, having failed to appear at the trial, apparently could not be served by the New York police with a warrant issued by the court on her failure to honor the defense subpoena. The trial court's finding as to unavailability, and its refusal to admit Coreano's testimony if it was material, constituted not merely evidentiary error but, as the district court concluded, constitutional error.[3]

---

**3.** In habeas proceedings "a determination after a hearing on the merits of a factual issue, made by a state court of competent jurisdiction ..., shall be presumed to be correct," 28 U.S.C.

§ 2254(d), unless the federal court determines that the state-court finding of fact is "not fairly supported by the record." *Id.* § 2254(d)(8); *see*

It is true that erroneous evidentiary rulings do not automatically rise to the level of constitutional error. The court's duty on a petition for *habeas corpus* is to determine whether the excluded testimony was material to the presentation of the defense so as to deprive the defendant of fundamental fairness. The court must determine whether the exclusion was an error of constitutional dimension, and whether that constitutional error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705, *rehearing denied*, 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed. 2d 241 (1967); *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.), *cert. denied*, 464 U.S. 1000, 104 S.Ct. 503, 78 L.Ed.2d 694 (1983).

The right to present a defense is one of the "minimum essentials of a fair trial." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973), citing *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948). It is a right which derives not only from the general fairness requirements of the due process clause of the fourteenth amendment but also, and more directly, from the compulsory process clause of the sixth amendment. It is a right which comprehends more than the right to present the direct testimony of live witnesses, and includes the right under certain circumstances, to place before the jury secondary forms of evidence, such as hearsay or, as here, prior testimony. *Chambers*, 410 U.S. 284, 93 S.Ct. 1038.

A defendant has the constitutional right to introduce a secondary form of evidence such as prior testimony when two circumstances are present: first, the evidence bears sufficient indicia of reliability, *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980); and second, the witness who gave the original testimony is no longer available. *United States ex rel. Bracey v. Fairman*, 712 F.2d

315, 318 (7th Cir.1983). Prior testimony where the same party has had a full and fair opportunity to cross-examine the witness is a reliable form of such evidence. In the instant case, as noted by the district court, 658 F.Supp. at 1414, "we are dealing not only with a prior trial where the same party had a full and fair opportunity to cross-examine, but to [sic] one where that party was represented by the very same lawyer now objecting to the use of the testimony." The state does not argue that the testimony is not reliable; it argues its materiality.

The question of whether the witness, who gave the original testimony, is no longer available has in most cases arisen where the witness is a *prosecution* witness, not a *defense* witness. The claim of unavailability is usually made in the face of a claim by the defense that the use of the prior testimony of the witness violates defendant's right of confrontation under the sixth amendment.

In *Roberts*, the Supreme Court made it clear that the asserted unavailability of a prosecution witness is a federal constitutional question. The Court stated that such a witness is not unavailable "for purposes of ... the exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial." 448 U.S. at 74, 100 S.Ct. at 2543 (emphasis in original; quoting *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968)).

Unless a defendant's rights under the confrontation clause are greater than under the compulsory process clause of the sixth amendment, it seems clear that a good faith effort to locate a witness is the standard with respect to either clause. A state court finding that a defense witness is *not* unavailable necessarily limits a defendant's right under the compulsory process clause. We must therefore apply to a

*Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct 1303, 1307, 71 L.Ed.2d 480 (1982).

However, the trial court's conclusion that Coreano was not unavailable was a mixed question of law and fact that is not governed by

§ 2254(d). *See Cuyler v. Sullivan*, 446 U.S. 335, 341, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). Accordingly, the district court was not restricted from finding Coreano was in fact unavailable under the New York statute. *See note 2, supra*.

defendant seeking to demonstrate the unavailability of a witness the same constitutional standard that applies to a prosecutor seeking to establish the same thing, i.e., a good faith effort to locate the witness. We do not believe such a standard is incompatible with the New York statute, N.Y.Crim. Proc.Law § 670.10(1) (McKinney 1984),[4] pursuant to which the defense sought to introduce the perpetuated testimony of Coreano. The New York Court of Appeals has observed that the purpose of the due diligence requirement of that statute is to ensure that failure to produce the witness "was not due to indifference or a strategic preference for presenting [the witness' testimony in the more sheltered form of ... minutes rather than in the confrontational setting of a personal appearance on the stand." *People v. Arroyo*, 54 N.Y.2d 567, 571, 446 N.Y.S.2d 910, 913, 431 N.E.2d 271, 274, *cert. denied*, 456 U.S. 979, 102 S.Ct. 2248, 72 L.Ed.2d 855 (1982). We therefore agree that the exclusion of Coreano's perpetuated testimony at the trial was error.

However, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue *only* where [the] petitioner can show that the error deprived [him] of a *fundamentally fair* trial." *Taylor v. Curry*, 708 F.2d at 891 (emphasis in the original; citations omitted). It is the materiality of the excluded evidence to the presentation of the defense that determines whether a defendant has been deprived of a fundamentally fair trial. *Id.* The standard for determining materiality where evidence is excluded has been defined by the Supreme Court.

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the Court was concerned with evidence (undisclosed by the prosecution) that the murder victim had a prior criminal record which might have supported the argument that the defendant had acted in self defense. In discussing the constitutional standard of materiality the Court stated:

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. *It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed.* This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*Agurs*, 427 U.S. at 112–13, 96 S.Ct. at 2401–02, (emphasis added; footnotes omitted).

The state claims here, as it did in the district court, that whether or not the trial court erred in precluding Coreano's perpetuated testimony, such testimony was inadmissible because it was extrinsic evidence on a collateral matter.[5]

The determinative question in deciding whether extrinsic evidence contradicting a witness's testimony is admissible is not whether the contradicting extrinsic evidence is material or collateral, but rather

**4.** *See* note 2, *supra*.

**5.** The affirmance of the trial court's decision without opinion did not, as the state contends, Appellant's Brief at 16–17, constitute a holding that Coreano's testimony was immaterial as a matter of law. In order to affirm, the appellate division need have accepted only one of the state's alternative theories, i.e., that the defense had not demonstrated that Coreano was unavailable, or that her testimony was immaterial. Under New York law an affirmance without

opinion is of little precedential value. "Certainly it cannot be said that judicial precedent or even esoteric significance of some sort is to be found in an affirmance without opinion, the basis of which cannot with certainty be demonstrated, and certainly cannot be ascertained and followed by other courts or by the bar." *Fragale v. Armory Maintenance*, 24 A.D.2d 302, 305, 265 N.Y.S.2d 793, 797 (3d Dep't), *aff'd on opinion below*, 18 N.Y.2d 729, 274 N.Y.S.2d 168, 220 N.E.2d 810 (1966).

whether the assertions that the impeaching party seeks to contradict are themselves material or collateral. In determining whether the testimony to be contradicted is material or collateral New York courts have adopted a test proposed in *Attorney–General v. Hitchcock,* 1 Exch. 91, 99 (1847), and put forth by 3A J. Wigmore, *Evidence* § 1003 (Chadbourne rev. 1970). *People v. Schwartzman,* 24 N.Y.2d 241, 299 N.Y.S.2d 817, 247 N.E.2d 642, *cert. denied,* 396 U.S. 846, 90 S.Ct. 103, 24 L.Ed. 2d 96 (1969).

The *Schwartzman* court held that "a fact is not a collateral matter if it could be shown in evidence for any purpose independent of the contradiction." 24 N.Y.2d at 246, 299 N.Y.S.2d at 821, 247 N.E.2d at 645.

■ The underlying facts which the defense sought to contradict were Cartagena's claims that, although he lived in Manhattan: (1) he was in the neighborhood of the crime on October 12, 1974 because he shared an apartment in the neighborhood with Lopez; (2) he was on the block where the crime occurred because he had gone with Lopez to buy a tube for the television set in that apartment; and (3) he was with Lopez when he observed the crime. Cartagena's testimony regarding these claims could clearly be shown in evidence for a purpose independent of the contradiction for these claims were relevant to the prosecution's case. They explained and elaborated Cartagena's claim to be a witness to the crime.

There is another test for materiality which has been formulated by McCormick who observed that "any part of the witness' account of the background and circumstances of a material transaction, which as a matter of human experience he could not have been mistaken about if his story was true" is material. McCormick on *Evidence* § 47 (3d ed. 1984). Cartagena's testimony concerning Lopez was part "of the background and circumstances of" his observation of the crime. Moreover, "as a matter of human experience, he could not have been mistaken about [Lopez] if his story was true." *Id.*

*United States v. Robinson,* 544 F.2d 110 (2d Cir.1976), *cert. denied,* 434 U.S. 1050, 98 S.Ct. 901, 54 L.Ed.2d 803 (1978), mirrors certain facets of the instant case. In *Robinson* the defense called an alibi witness who testified that he remembered the day of the crime because he had gone to pick up an unemployment check on that day. This court observed that it was "of course proper" for the government to contradict this testimony with extrinsic evidence showing that the witness had not been issued an unemployment check on that day. *Id.* at 114. Whether the witness did or did not receive a check on the day in question may seem collateral, but the underlying assertion sought to be contradicted—that the witness remembered the day in question, i.e., the day of the crime—clearly was not.

Similarly, Cartagena's assertion that he was with Lopez at the crime site could be contradicted by extrinsic evidence that he did not know Lopez at that time. Cartagena's presence at the scene of the crime was a fact, under federal law, "that is of consequence" in making the "determination of the action more probable or less probable than it would be without the evidence." Federal Rule of Evidence 401.

The state has not cited any case in which any court has found inadmissible testimony directly contradicting a witness' account of his whereabouts and activities at the time of the crime. Judge Knapp found it "simply frivolous to attribute immateriality to testimony which would have entitled the jury to find that the [state's] only identifying witness ... had resorted to perjury to explain his presence at the scene of the crime." 658 F.Supp. at 1413.

The omission of Coreano's testimony "must be evaluated in the context of the entire record." *Agurs,* 427 U.S. at 112, 96 S.Ct. at 2402. Cartagena was the sole witness, his testimony the only evidence to identify Rosario as one of the perpetrators. None of the customers in the grocery store or Camacho, the young boy who was wounded, identified Rosario. Moreover, Coreano was to be Rosario's only witness. When the defense made a final effort, at

the end of the prosecution's case, to introduce Coreano's evidence and was precluded from doing so, it rested without introducing any evidence. Furthermore, the only corroboration of Cartagena's testimony as to the identification of the two men involved in the robbery was the discovery of Cruz's fingerprint in a house on Messerole Street. Cartagena had testified that Cruz ran down Messerole Street after the shooting. This was scarcely corroboration as to Rosario. Coreano was quite definite in her testimony that Cartagena had not met Lopez until January or February of 1975. She was a first cousin of Cartagena's and had known him all her life. Cartagena's mother was her next door neighbor. She was fully aware of the date of the robbery-homicide, i.e., October 12, 1974.

It is instructive to correlate Coreano's testimony with that of Cartagena. Coreano testified that she first met Lopez in November 1974. Lopez was working in a bar owned by Coreano's brother-in-law at 53rd Street and Third Avenue, Brooklyn. Cartagena testified he was familiar with this bar. Coreano testified that, two weeks after she met her, Lopez came to live with her at 139 South First Street. Cartagena testified that before he and Lopez had started sharing an apartment Lopez had been living with his cousin, i.e., Coreano, at 139 South First Street. Coreano testified that when Lopez came to live with her Lopez had not met Cartagena because he was in prison. Cartagena testified that on October 20, 1974 he had been arrested for armed robbery and had been jailed in Brooklyn. Since Cartagena testified that he began to share an apartment with Lopez *after* she had been living with Coreano, he could not have been sharing an apartment with Lopez at the time of the robbery-homicide. In other words, a jury could find that Cartagena was predating a later affair with Lopez to explain his presence at the scene of the crime.

The state argues that the defense was not prejudiced by the exclusion of Coreano's testimony because the defense was able to capitalize on hearsay testimony that Lopez could not remember whether she was with Cartagena on the day of the murder. Defense counsel argued in summation that Lopez's statement proved she could not have been there, since if she had been she would undoubtedly have remembered it.[6] However, it is clear that the testimony of Coreano rebutting Cartagena's testimony on a material point would have been much more convincing than the argument of counsel based on hearsay which suggested but did not directly support the claim that Cartagena was lying. *Chambers*, 410 U.S. at 294, 93 S.Ct. at 1045; *United States v. Di Maria*, 727 F.2d 265, 272 (2d Cir.1984). The state cites no case in support of its argument of non-prejudice to the defense where the testimony sought to be impeached was the only evidence linking the defendant with the crime.

There is no evidence, other than the testimony of Cartagena, that Rosario was present at the scene of the crime, or indeed that Cartagena was himself present.

## CONCLUSION

After reviewing the entire record and evaluating Coreano's perpetuated testimony in the context of that record we find that such testimony, if received in evidence, could have created a reasonable doubt that did not otherwise exist and that such preclusion deprived Rosario of his fundamental right to a fair trial.

Accordingly, we affirm.

---

**6.** Cartagena testified he talked with Lopez about the shooting shortly after it happened and that "it was a thing you don't forget very easily."