**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**John Charles BURGE, Defendant–Appellant.**

**No. 92–1114.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 4, 1992.

Decided Dec. 28, 1992.*

Certiorari Denied May 17, 1993.
See 113 S.Ct. 2379.

and compensatory and punitive damages pursuant to the Revised Civil Rights Act of 1991.

* This decision was originally issued as an "unpublished decision" filed on December 28, 1992.

On March 11, 1993, the court designated the opinion as one recommended for full-text publication.

Eric M. Straus, Asst. U.S. Atty. (argued and briefed), U.S. Department of Justice, Detroit, MI, for plaintiff-appellee.

Jill L. Price, David C. Tholen (argued and briefed), Detroit, MI, for defendant-appellant.

Before MERRITT, Chief Judge; and GUY and RYAN, Circuit Judges.

PER CURIAM.

Defendant appeals his conviction on seven counts of receiving bribery payments as a labor union employee in violation of the Taft–Hartley Act and two counts of filing false and fraudulent income tax returns. Defendant contends the trial judge erred in two ways: limiting the scope of his examination of a federal agent and refusing to instruct the jury on his defenses as requested by counsel. Defendant also argues that there was insufficient evidence to support the conviction. Finding no merit in defendant's claims of error, we affirm.

## I.

This case involves alleged union-management corruption in the air freight industry at Detroit Metropolitan Airport between 1984 and 1986. Defendant, John Burge, was a business agent of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 124. During this time, Locals 124 and 299 were involved in "turf wars," constantly competing to represent more employees of the various air freight companies.

In April 1985, defendant approached Carlos Calio, the president and owner of Trans–Overseas Corporation, an air freight business. Defendant informed Calio that Local 299 was considering organizing Trans–Overseas' employees. He informed Calio that if Local 124 represented the employees it would not insist on as high wage rates; would permit Trans–Overseas to maintain its current health, welfare, and pension benefits; and that Trans–Overseas would avoid picketing. To benefit from this arrangement, Burge informed Calio that Trans–Overseas would need to engage a labor consulting firm, paying an initial retainer fee of $750, and monthly payments thereafter of $150. Later that same month Trans–Overseas received a $750 invoice from Western Enterprises for "consulting services rendered." Bank records indicate that defendant was the president and owner of Western Enterprises. The signature card for Western Enterprises' bank account, under "type of business," listed "assumed name." Calio contacted the Department of Labor and informed them of Burge's activities.

At the next meeting between Calio and Burge, Calio wore a wire while special agents physically surveilled the meeting. Other conversations were taped as well. Several of these tapes were played for the jury. Burge informed Calio that when one of Calio's competitors declined a similar arrangement Local 299 struck that company. Burge also discussed with Calio the benefits of an arrangement called labor leasing. In negotiating the "consulting fees" with Calio, Burge referred to the consulting company in the third person.

In December 1985, federal agents executed search warrants on defendant's resi-

dence and several air freight companies near Metropolitan Airport, seizing records indicating payments to Western Enterprises from the companies. The companies searched included Airport Distributors, Inc. and J.S.G. Haulage Corporation, both owned by Joseph Suriano; and Timely Air Freight, owned by Charles Hall. The records seized led to the charges in this case.

Defendant was indicted on seven counts of accepting payments as a labor union officer or employee in violation of the Taft–Hartley Act.[1] Counts one through four involved payments received from the companies owned by Joseph Suriano. Counts five through seven involved payments received from the company owned by Charles Hall.[2] Charles Hall was also charged with a one-count violation of the Taft–Hartley Act for unlawful payment to a union employee. Hall pled guilty pursuant to a Rule 11 plea agreement that required Hall to testify at the grand jury and at trial. Joseph Suriano testified in the present action pursuant to a grant of immunity under a compulsion order.

Burge had contacted Hall in an attempt to organize Hall's employees. Prior to contacting Hall, Hall's company had been vandalized—nails spread on the driveway and truck windshields broken. Burge convinced Hall that signing a representation agreement with Local 124 would be far better for the company than an agreement with Local 299. Hall's company eventually signed a recognition agreement with Local 124 containing economic terms far more favorable than Local 299 would have allowed. Hall also agreed that his company would pay Western Enterprises a monthly consulting fee. During the first six months of this arrangement, Burge did provide some advice on matters such as the set up and operation of the company's dock. After the first six months, the payments continued; yet, Burge provided no services of value.

Hall testified Burge would often bring the invoice for Western Enterprises with him when he came to pick up the check for union dues. Sometimes he even wrote out the invoice when he got there. Every month Burge would tell them horror stories in the industry—obstruction of business, strikes, or companies in trouble. Burge also repeatedly reminded Hall that he was Jimmy Hoffa's nephew. When collecting the payments, he sometimes told Hall that he would "take care of him." Hall testified he understood the payments were made because of Burge's status with Local 124 and his apparent ability to maintain labor peace for the company. Hall paid approximately $23,000 for consulting services between February 1984 and December 1985. Hall stopped making payments to Western Enterprises after the search by federal agents. A week after the search, Burge contacted Hall and asked, "Why don't you continue the payments so it looks legitimate?"

1. Defendant was charged with seven counts of violating 29 U.S.C. § 186(b) based on § 186(a)(4). Title 29 U.S.C. § 186 provides in pertinent part:

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

. . . .

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

(b)(1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

2. Defendant and his wife, Kathleen Burge, were also charged with two counts of filing false and fraudulent income tax returns in violation of 26 U.S.C. § 7206. Sixty-six payments made to Western Enterprises, totalling approximately $34,000, were not reported on defendants' joint income tax returns for 1984 and 1985. Kathleen Burge was found not guilty. Defendant was found guilty of all counts against him. Defendant makes no arguments regarding his convictions on these two counts. Seven of the 66 payments were charged as violations of the Taft–Hartley Act. Prosecution for the remaining payments were barred by the statute of limitations.

Burge met with Joseph Suriano in the fall of 1984 in an attempt to organize the employees of Airport Distributors. At that time, Local 299 already represented Suriano's other company, J.G.S. Haulage. After Suriano rejected Burge's invitation to join Local 124, Local 299 attempted to organize the employees of Airport Distributors. The company began to experience equipment breakdowns, damages, and vandalism. Eventually a week-long strike occurred, ending in the recognition of Local 299 as the bargaining representative of the employees. After the recognition agreement was signed, Burge called Suriano. Suriano testified that Burge "explained that I had—should have listened to him earlier because now I had the problems...."

In March 1985, Burge, through Western Enterprises, began receiving payments from Suriano for "labor consulting." Suriano described how that relationship came about:

> Well, John had asked us—that he had a—a friend in—in the business that was—that offered advice in this type of situation[ ] that we would have, and he worked for this company occasionally on a part-time basis and that he would give us advice—of course, that he would have the background of a consultant through these other people, whoever they—whoever they were, at the time.

Suriano testified that Burge told him he was not a partner or owner of Western Enterprises, that he just worked for them. Burge advised Suriano how to negotiate a better contract with Local 299, a contract more like those used by Local 124. Burge also counseled Suriano on how to defeat the union with various tactics designed to cause attrition among the employees and suggested the use of a labor leasing company. The monthly payments continued until federal agents executed the search warrant at Airport Distributors.

Defendant is quick to point out that this is not the first time he has had contact with federal authorities. In 1981, Burge was contacted by federal agents as a potential witness in the trial of three Teamsters.

Despite defendant's trial testimony, all three were acquitted. When the search warrant was executed at Burge's home in 1985, federal agents had ensured he would not be home by scheduling a meeting with him at a different location. Defendant contends this meeting was to solicit his cooperation in the government's cases against "bigger fish." Although several meetings occurred, an agreement could not be reached, and the government instituted a firearms possession charge in 1987 for two firearms seized in the 1985 search of defendant's home. A jury found Burge not guilty. The instant prosecution, begun in August 1990, followed defendant's refusal to cooperate with the government and defendant's acquittal of the firearms charges.

## II.

 Defendant claims the trial court violated his due process right to a fair trial when it limited the scope of his cross-examination of a government agent. The only testimony excluded was that portion given by Department of Labor Special Agent Craig Woodhouse, called as a witness *by the defendant,* not the government. Defendant argues that this exclusion constituted a deprivation of an effective cross-examination. Although when a party calls an adverse or hostile witness they may be allowed to proceed by leading questions, the examination is still a direct-examination. *Fotomat v. NLRB,* 634 F.2d 320, 326 n. 4 (6th Cir.1980). The cases cited by defendant, involving a limitation on a defense counsel's cross-examination of a witness already called and examined by the government, are materially different from the present case. When the government has used a witness to help establish its case, defense counsel should be given an opportunity to question that witness regarding holes in the testimony given on direct-examination, credibility, and other relevant matters. However, Burge was not seeking to examine a witness called by the government. The government established its case without any testimony from Agent Woodhouse. Burge was seeking to engage in *direct*-examination of a witness, albeit an adverse one.

■ Defendant also argues, however, that the exclusion of certain testimony from Agent Woodhouse impaired the presentation of his defense. The right to present a defense is one of the "minimum essentials of a fair trial." *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). "It is the materiality of the excluded evidence to the presentation of the defense that determines whether a defendant has been deprived of a fundamentally fair trial." *Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir.1988).

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.

*United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976) (footnotes omitted).

The court allowed a separate record to be made of the direct examination of Agent Woodhouse. That record established the history between the agents and defendant and that the government had been seeking defendant's cooperation at the time of the 1985 search. In that separate record, Agent Woodhouse also testified that Burge was told his cooperation would impact his subsequent prosecution, and when Burge refused to cooperate the two prosecutions followed. The court refused to allow that testimony before the jury. The court did allow Agent Woodhouse to testify that the government scheduled a meeting at the same time as the search so defendant would not be present at the time a search warrant was executed. Also, Woodhouse was allowed to testify regarding Carlos Calio's reluctance to cooperate with the government.

Defendant argues that he was not allowed to examine Agent Woodhouse regarding the agent's bias against the defendant and that his alleged bias went directly to the issue of the agent's credibility. The government's case was made without the testimony of Agent Woodhouse. We fail to see how this excluded testimony, which may have reflected on the credibility of Agent Woodhouse's testimony, would have helped to establish a reasonable doubt as to whether the defendant committed the crimes charged.

Defendant argues that this material should have been admitted to show the bias of the entire government's case. It is clear that in calling Woodhouse as a witness defendant hoped to weaken the government's case by showing their motives in prosecuting him. As argued before this court, defendant

> attempted to show that the current prosecution was but one part of a pattern of government harassment of Defendant[ ] aimed at coercing his cooperation in other government investigations of the Teamster's Union. He contended that he had been targeted for this coercion because of his unique position as both a member and employee of the Union, as well as the fact that he was the nephew of former Teamster's President, James P. Hoffa.

(Defendant's Brief at 4).

■ We do not adopt the government's argument that the evidence of the government's motivation should not be presented to the jury because it is relevant only to a claim of vindictive prosecution, which should be decided by the judge not the jury. Insofar as evidence of the government's motives may cast doubt on the credibility of evidence or testimony presented by the government, it is certainly relevant to the defendant's case. *See, e.g., United States v. Salerno*, 937 F.2d 797 (2d Cir. 1991) (refusal to allow inquiry into bias of FBI agents who *selectively* recorded and transcribed conversations of defendant was reversible error), *rev'd on other grounds*, —— U.S. ——, 112 S.Ct. 2503, 120 L.Ed.2d 255 (1992). However, the defen-

dant's right to examine a government witness to elicit evidence of bias is not absolute. *Salerno,* 937 F.2d at 810. Here, the judge prohibited inquiry into defendant's refusal to cooperate as the reason the present charges were brought. The heart of the government's case concerning the bribery charges consisted of testimony of employers who made payments to Western Enterprises. In this context, the testimony regarding the government's motives in prosecuting the defendant would not, in any significant way, reflect on the credibility of those witnesses. The fact that Hall testified under a plea agreement and Suriano testified under a grant of immunity was revealed to the jury.

■ In addition, the testimony excluded certainly had a potential to confuse the jury as to the issues in the case. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). Such wide latitude also applies in the case before us even though the limitation was of direct-examination. We review evidentiary rulings under an abuse of discretion standard. *United States v. Mahar,* 801 F.2d 1477, 1495 (6th Cir.1986). We cannot say that the trial judge's limitation of the examination of Agent Woodhouse was an abuse of discretion.

### III.

■ Defendant claims the trial court violated his due process right to a fair trial by refusing to instruct the jury on all theories of defense raised by counsel. "[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54 (1988).

[W]hen a theory of defense finds some support in the evidence and in the law, a defendant is entitled to some mention of that theory in the instructions. Even when the supporting evidence is weak or of doubtful credibility its presence requires an instruction on the theory of defense.

*United States v. Garner,* 529 F.2d 962, 970 (6th Cir.) (citations omitted), *cert. denied,* 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 124 (1976).

Defendant claims it was reversible error for the judge to refuse to give his first two proposed jury instructions regarding the employee exception to 29 U.S.C. § 186. That exception exempts payments an employer makes "to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer...." 29 U.S.C. § 186(c)(1) (Supp. 1992). The Taft–Hartley Act incorporates the definition of "employee" used in the National Labor Relations Act: "The term 'employee' ... shall not include ... any individual having the status of an independent contractor...." 29 U.S.C. § 152(3).

Defendant argues that he performed consulting services for both Suriano and Hall and that he also performed other tasks, such as repossessing an automobile and two file cabinets. We find that defendant was not an "employee," as that term is defined under the Taft–Hartley Act, of either Airport Distributors or Timely Air Freight. If anything, defendant was an independent contractor. Additionally, although defendant may have initially performed some legitimate services, defendant offered no evidence that he was still performing any service of value at the time of the payments which gave rise to the present charges. Thus, defendant was not entitled to the requested instructions.

■ Even though defendant had offered insufficient proof of his alleged status as an "employee," the trial judge gave defendant the benefit of an instruction that sub-

stantially covered his proposed defense.[3] The denial of a requested instruction is not reversible error if that instruction is substantially covered by the charge actually delivered to the jury. *See United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991). Defendant was not denied his due process rights by the trial court's refusal to give defendant's first two requested instructions.

## IV.

■ Defendant's final basis for appeal is that there was insufficient evidence to sustain his conviction. "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Under such inquiry, we are required to view all of the evidence in the light most favorable to the prosecution. *Id.* Thus, defendant's burden is very heavy. *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).

To establish a violation of § 186(b)(1), based on an unlawful act under § 186(a)(4), the government must prove: (1) that the defendant was an officer or employee of a labor organization; (2) that the labor organization was engaged in an industry affecting interstate commerce; (3) that the defendant directly or indirectly requested, demanded, received, or accepted, or agreed to receive or accept any payment, loan, or delivery of money or other thing of value; (4) that the employer, by making such payment, intended to influence the defendant with respect to any of his actions, decisions, and duties involving such labor orga-

nizations; and (5) that the defendant acted knowingly and willfully. *See* 29 U.S.C. § 186(a)(4), (b), (d) (1978 & Supp.1992).

Defendant argues that the government failed to establish that he acted with the requisite intent. He contends that the testimony shows he was paid for services and that the employers would not be paying to influence him in his union capacity because he was an employee of Local 124 and therefore had no authority over Local 299. Defendant's arguments are without merit on the issue of intent. Defendant established Western Enterprises. In the context of labor union organizing, he approached employers and suggested they engage a labor consultant. He was paid approximately $34,000 for, at best, minor services. Payments continued even after he no longer was providing *any* services of value. Burge's statement to Hall after the searches occurred requesting Hall to "continue the payments so it looks legitimate" further shows Burge's knowledge and intent. The fact that he was an employee of Local 124 and not Local 299 does not mean that the employers did not intend to influence his actions, decisions, or duties. There is no requirement that the person soliciting or receiving payments be an official or agent of the organization that currently represents employees of that employer. Clearly, there was sufficient evidence to support a finding that defendant acted knowingly and willfully.

Accordingly, the jury verdict finding the defendant guilty on all counts is AFFIRMED.

---

**3.** The trial judge instructed the jury as follows:

Now, it is the theory of the defendant John Burge concerning these Counts One through Seven as follows: John Burge denies violating the law. Mr. Burge asserts that he was hired by the companies to perform services and that he received the payments in return for specific services provided by him. He contends that he performed such services as collection, repossession, business referrals, and operat-

ing advice. Mr. Burge insists that the payments were for his services only and that— and that the payments were not for the purpose of influencing his role as a union employee for Teamster Local 124. It is Mr. Burge's contention that the payments could not have been for the purpose of influencing his role as a union employee, since his employer, Local 124, could not represent the companies for which he worked.