**Tinh PHAN, Petitioner,**

v.

**Charles GREINER, Superintendent, Sing Sing Correctional Facility, Respondent.**

**No. 98–CV–0422 (ERK).**

United States District Court, E.D. New York.

Oct. 3, 2001.

Vivian Shevitz, South Salem, NY, for Petitioner.

Victor Barall, Assistant District Attorney, Brooklyn, NY, for Respondent.

## MEMORANDUM & ORDER

KORMAN, Chief Judge.

Tinh Phan seeks habeas corpus relief from his conviction for one count of second-degree murder, one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree. After a jury trial, petitioner was sentenced to concurrent terms of twenty years to life for the murder conviction, three to nine years on the second-degree weapon charge, and two to six years on the third-degree weapon charge. The Appellate Division affirmed the conviction, *People v. Phan*, 208 A.D.2d 659, 617 N.Y.S.2d 480 (2d Dep't 1994), and leave to appeal to the New York Court of Appeals was denied. 85 N.Y.2d 867, 624 N.Y.S.2d 386, 648 N.E.2d 806 (1995).

The underlying crimes were committed on the night of July 30, 1988, when Thomas Stahl was shot and killed outside of a pool hall in Bay Ridge, Brooklyn. Petitioner seeks relief on two grounds. First, he claims that the trial judge deprived him of his right to present a defense by refusing to permit his counsel to question a witness about the witness's failure to identify petitioner at a lineup held the morning after the shooting. Second, petitioner claims that the trial judge erred in refusing to admit the grand jury testimony of two witnesses, one of whom testified that petitioner was inside the pool hall at the time of the shooting. He claims that these witnesses were unavailable at trial despite his good faith effort to secure their testimony.

## BACKGROUND

At approximately 11:45 to 11:50 P.M. on the night of July 30, 1988, Thomas Stahl, the victim, and John Halkias, his friend, were walking down 5th Avenue towards a pool hall and bar located on 70th Street between 5th Avenue and 6th Avenue in Brooklyn. Trial Transcript, 265 ("Tr."). Halkias was walking ahead of Stahl, and after he passed two or three Asian men, Tr. 266, an argument started between Stahl and one of the Asian men. Tr. 267; 575–77. As the argument progressed, Stahl, Halkias, and the Asian men continued walking towards the pool hall. Tr. 268. One of the Asian men went into the pool hall and emerged with three or four additional Asian men. Tr. 268–69. Stahl hit one of the Asian men, causing him to fall down. Tr. 269–70. This man may have hit Stahl first. Tr. 615. At that point, another one of the Asian men went into the pool hall, and returned with several more Asian men. Tr. 270. This second group of Asian men walked toward a black car parked on the corner of 5th Avenue and 70th Street. One of these men returned to the location of the argument with his hands behind his back. Tr. 270. This man shot Stahl in the chest, and as Stahl was falling to the ground, the same

man shot him in the back. Tr. 272–73; 578.

After the shooting, Halkias began running towards the corner of 5th Avenue and 70th Street. Tr. 274. The shooter and several other Asian men were "scuffling around with the gun"—passing it off to each other—and the gun ultimately ended up in the hands of an Asian man wearing a black tank-top, not the one who shot Stahl. Tr. 581, 632. Halkias slipped as he was running, heard another shot fired behind him, and then continued running around the corner towards 69th Street. Tr. 274. Halkias then heard two clicks behind him. He looked back over his shoulder and saw the "upper part" of the Asian man who was chasing him and that the man was carrying a gun. Tr. 275. Halkias ran into a Greek restaurant, located on 5th Avenue between 70th Street and 69th Street. Tr. 277. The owners of the restaurant asked him to leave, and as he walked to the front of the restaurant, he saw the Asian man who had been chasing him through the window of the restaurant, looking at him. Tr. 277–78. When the Asian man ran back towards the corner of 70th Street and 5th Avenue, Halkias ran into a bar on 69th Street and called the police. Tr. 281–83. On his way, Halkias observed several individuals, who may have been outside the pool hall when Stahl was shot, running towards the black car that he had seen earlier on the corner of 5th Avenue and 70th Street. Tr. 281–82. The car was moving slowly. Tr. 281. An individual opened the trunk of the car, put something inside, and then the car "sped off." Tr. 627. Halkias returned to the bar next to the pool hall and went with one of the detectives to the hospital where Stahl was taken. Tr. 283–84.

The foregoing narrative came primarily from the testimony of Halkias. Another witness, Alex Nikolaou, a friend of Stahl and Halkias, testified that at about 11:50 p.m. he was walking on 5th Avenue towards the corner of 5th Avenue and 70th Street. Tr. 345. From a distance of 50 to 60 feet, Nikolaou saw three Asian men chasing Halkias and a second individual named Chris (whom Halkias did not mention) around the corner towards 69th Street. Tr. 345–47. One of the Asian men was walking away from the scene. Tr. 347. He also saw one of the Asian men, who had black hair and was "wearing a black shirt an[d] long sleeves down to [his] elbows," hand something to a second Asian man, who had black hair and was wearing a black tank-top. Tr. 347–49. He later saw five Asian men against the fence, and stated that among them were the Asian men that he had earlier seen running after Halkias and Chris. Tr. 352–53, 368. Nikolaou stated that he told Detective David Hearn that he recognized three of the Asian men who were detained against the fence, and that he testified to that effect before the grand jury. Tr. 424–25. However, Detective Hearn testified that Nikolaou did not tell him that he recognized three of the Asian men against the fence, Tr. 918, and the prosecutor stipulated that Nikolaou was not asked at the grand jury whether he recognized any of the Asian men being held against the fence, and therefore he did not answer to that effect. Tr. 434.

Petitioner was arrested on the night of the incident. While it is not entirely clear, the basis for the arrest appears to have been a statement by James McGakey, who had witnessed the incident, that a group of five Asians (of whom petitioner was one) were "involved" in the shooting. Tr. 98–99 (Wade Hearing, Sept. 29, 1989). At a line-up held the following morning, McGakey identified petitioner as the person who shot Stahl. At the same lineup, Halkias identified petitioner's co-defendant, Nguyen, as the person who shot Stahl. By the

time the case went to trial, Halkias was unable to identify anyone as the person who shot Stahl, although he identified Nguyen as the person who shot at him. This left McGakey as the only witness against petitioner. McGakey testified that he was directly across the street from the pool hall at 11:50 P.M. on the night of the incident. He had walked his girlfriend home, and was traveling via skateboard on 70th Street, from 6th Avenue to 5th Avenue. Tr. 574–75. McGakey stated that he saw five Asian men circling Stahl in front of the pool hall, and that Stahl and one of the Asian men were arguing and pushing each other. Tr. 576–77. He testified that a different Asian man shot Stahl in the chest and back, Tr. 577–78, and identified petitioner at trial as this shooter. Tr. 578. He claimed that his view of petitioner's face was unobstructed, described the lighting condition in front of the pool hall as "very bright," due to the street light, the light from the pool hall, and the light from a sign that read "billiards, pool room," Tr. 579, 611, and added that there was a street light on his side of 70th Street as well. Tr. 579. He also testified that he waited with Stahl in the bar next to the pool hall until the paramedics arrived, and that upon exiting the bar, several police officers directed him across the street where five Asian men were detained by the police. He told a detective that he recognized one of these men as the individual who shot Stahl. Tr. 586–87. However, Officer George Massa testified at the Wade hearing that McGakey told him that "those five male Asians were involved in the shooting." Tr. 87 (Wade Hearing, Sept. 29, 1989). At the lineup held the next day comprised of the five Asian men, McGakey identified petitioner as the person who shot Stahl.

McGakey himself had a criminal record, and on cross-examination defense counsel elicited several inconsistencies between McGakey's trial testimony and his testimony at the pretrial Wade hearing. For example, McGakey testified at the Wade hearing that he witnessed the incident from a distance of thirty-five feet, whereas at trial he testified that the distance was fourteen feet. Tr. 608–09. McGakey explained at trial that he first saw the argument from a distance of thirty feet, but witnessed the actual shooting from a closer distance because he was proceeding across the street. Tr. 609. When defense counsel contradicted this account by introducing McGakey's Wade hearing testimony, in which he stated that he was between two parked cars when he witnessed the incident because he had stopped there when he saw the gun and heard the shots, Tr. 609, 623, McGakey explained that he was between two parked cars during the first shot, but had walked into the middle of the street by the time of the second shot. Tr. 609. Lastly, McGakey testified at the Wade hearing that the incident took fifteen to twenty minutes, but stated at trial that the "whole scene" lasted about ten minutes. Tr. 619–20.

Defense counsel also drew out several inconsistencies between McGakey's account of the incident and the accounts of several of the prosecution's other witnesses. For example, McGakey testified that Stahl hit the Asian man with whom he was arguing after the man hit him, and that neither of the two fell down. Tr. 577, 615. Halkias, however, testified that Stahl hit the Asian man, not that the Asian man hit Stahl, and that the man did fall to the ground. Tr. 269–70. Additionally, McGakey testified at trial that the shooter was wearing a black shirt with rolled-up sleeves, black pants, and a white necklace, Tr. 579–80, while Detective Hearn testified that petitioner's necklace was "either a black or a dark brown." Tr. 918. McGakey also testified that the shooter was "already there" among the Asian men who

surrounded Stahl. Tr. 628. Halkias, however, testified that a group of Asian men exited the pool hall, walked to a black car parked on the corner of 5th Avenue and 70th Street, and that one of these men walked towards the location of the argument with his hands behind his back and shot Stahl. Tr. 270–72.

This discrepancy cannot be reconciled by the suggestion "that, by the time McGakey arrived on the scene, he had missed the initial events leading up to the shooting, as described by Halkias." Supplementary Affidavit in Opposition to Petition for a Writ of Habeas Corpus, at 38–39. McGakey, however, did not appear on the scene just before Stahl was shot. McGakey testified that at 11:50 P.M., he saw Stahl "getting into an argument with a few male Orientals across the street in front of the pool hall," Tr. 575, and that he observed the argument and the shooting for a "[f]ew minutes. No longer. Maybe ten minutes. The whole scene, when I got there, the argument started so I got to see the whole thing." Tr. 619–20. He also testified that the argument progressed from a verbal to a physical one, Tr. 615, and stated "I just saw [Stahl] arguing with another Asian Oriental and then they were both pushing each other back and forth and then another Oriental had a gun, he pulled out a gun and shot [Stahl]." Tr. 577.

The remaining evidence essentially consisted of testimony concerning the shooter's appearance. There were 15 to 20 Asians in the area, and five Asians surrounding Stahl. Tr. 616. McGakey testified that all (except one) wore black shirts or tank tops. Tr. 617. After the shooting, Halkias described the shooter as wearing a black shirt and black pants. Tr. 331. McGakey does not appear to have provided a contemporaneous description of the shooter, although he did point to five

Asians (of whom petitioner was one) as being involved in the shooting. Tr. 99 (Wade Hearing, Sept 28–29, 1989). McGakey testified at trial that the shooter, whom he identified at trial as petitioner, was wearing "a black shirt rolled up with a white necklace," Tr. 616, although at the Wade hearing McGakey seemed confused about whether the shooter wore a black tank top or a black shirt, Tr. 18, 21–23 (Wade Hearing, June 29, 1990). McGakey also testified that the shooter had black hair that was "puffy on top, came short on the end to the side burns, then long in the back," and was between five feet six inches and five feet eight inches tall. Tr. 618. Halkias testified at trial that the shooter was wearing black pants and a black T-shirt with rolled-up sleeves, had black hair that was "short on the side and kind of longish on top," was about five feet two inches tall, and appeared to be 18 or 19 years old. Tr. 270–71, 293.

The photograph of the lineup the next morning shows that of the five participants only two wore black shirts. The co-defendant, Nguyen, wore a black tank-top, and petitioner wore a black shirt with sleeves that appear to be rolled up, and some sort of necklace. The photograph of the lineup showed that petitioner's clothing matched the description given by McGakey at trial, although the necklace, rather than being white, more closely resembles the "leather thing" described by Detective Hearn who saw petitioner at the precinct. Tr. 901. Moreover, a photograph of petitioner when he was booked does not show his hair was "long in the back" as McGakey testified.

I note parenthetically that the evidence of McGakey's lineup identification of petitioner was excluded at trial. The record does not contain an oral or written decision for excluding the evidence, although it does indicate that the trial judge was con-

cerned that the same five Asians who McGakey had identified the night before as being involved were the participants in the lineup. Tr. 71–79 (Wade Hearing, September 28–29, 1989). In any event, he found that there was an independent source for McGakey's in-court identification.

Petitioner was convicted of one count of second-degree murder, one count of criminal possession of a weapon in the second degree, and one count of criminal possession of a weapon in the third degree. Petitioner's co-defendant, Nguyen, who had confessed to having participated in the chase of Halkias, Tr. 38 (Hearing, July 11, 1989), was convicted of the attempted murder of Halkias and the same two counts of criminal possession of a weapon. (Nguyen had turned down a generous plea offer that was conditioned on his agreeing to testify against petitioner. Tr. 5–6 (Wade Hearing, Sept. 28–29, 1989). When first questioned, he repeatedly said that someone named Richie shot Stahl. *Id.* 10, 39. A few weeks later at another interrogation he again told the detectives that they had arrested the wrong man as the shooter of Stahl, *id.* 36–37, and after further interrogation said that they had the right person. *Id.* 40. The references to petitioner were redacted from Nguyen's statement.)

Petitioner later moved to set aside the verdict pursuant to New York Criminal Procedure Law § 330.30 on grounds of newly discovered evidence. This evidence consisted of the affidavit of Helen Chen, a friend of petitioner's co-defendant, in which Chen described how petitioner's co-defendant and "people on the street" believed that an individual named "Richie" had committed the crime, Chen searched for and found Richie, and Richie admitted shooting Stahl and chasing Halkias. Chen claimed that she recorded a conversation in which Richie made these admissions.

This tape was submitted with the § 330.30 motion. The trial judge held hearings over a three-month period. He ultimately denied the motion, finding that the new evidence merely contradicted trial testimony, and would not have resulted in an acquittal. In July 1991, petitioner was sentenced to concurrent terms of twenty years to life for the murder conviction, three to nine years on the second-degree weapon charge, and two to six years on the third-degree weapon charge.

On January 11, 1996, petitioner filed a motion to vacate the judgment of conviction pursuant to New York Criminal Procedure Law § 440.10 on several grounds that are not relevant here. On April 7, 1997, during the pendency of his § 440.10 motion, petitioner filed a petition for a writ of habeas corpus. Petitioner later requested, and was granted, permission to withdraw his habeas petition without prejudice so as to exhaust his state court remedies. On April 16, 1997, counsel was appointed on the § 440.10 motion. Petitioner's § 440.10 motion was denied on June 30, 1997. Petitioner's application for leave to appeal the denial of his § 440.10 motion was denied by the Appellate Division on September 17, 1997.

Petitioner then filed a petition for a writ of habeas corpus. I assigned counsel to represent him. Following a hearing, the case was closed for administrative purposes to allow petitioner to exhaust his state court remedies with respect to an aspect of his ineffective assistance of counsel claim. On May 1, 2000, petitioner filed a motion for a writ error coram nobis on the ground that appellate counsel was ineffective for failing to raise the issue of whether trial counsel was ineffective in failing to argue for the admission of evidence that Halkias had identified petitioner's co-defendant at the pretrial lineup. After the motion was denied, *People v.*

*Phan,* 276 A.D.2d 505, 714 N.Y.S.2d 241 (2d Dep't 2000), the case was reopened.

### DISCUSSION

■ The Supreme Court has held that the right to present a defense is one of the "minimum essentials of a fair trial." *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Crane v. Kentucky,* 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (citations omitted)). Petitioner contends that he was denied his right to present a defense when the trial judge prevented him from eliciting that a witness had identified petitioner's co-defendant at a post-arrest lineup and when he refused to admit the grand jury testimony of two alibi witnesses that were not available to testify at trial.

### I. Halkias' identification of petitioner's co-defendant at the post-arrest lineup

■ Petitioner contends that the trial judge violated his right to present a defense by refusing to allow him to elicit from Halkias that he identified petitioner's co-defendant, Nguyen, at a lineup held the morning after the incident. The short answer to this argument is that petitioner's counsel did not ask the judge to admit this testimony. Instead, he only sought to elicit the fact that Halkias could not pick petitioner out as the shooter. Tr. 300–01. While the judge's refusal to allow that testimony was erroneous, it was not sufficiently prejudicial to justify setting aside the judgment of conviction because Halkias did not identify petitioner as the shooter

at the trial. Moreover, petitioner's claim that trial counsel was ineffective because he sought only to elicit that Halkias had been unable to identify petitioner, and not that Halkias had picked out Nguyen, also does not warrant relief because the jury ultimately heard about the misidentification that Halkias made in the aftermath of the shooting.

Specifically, Nguyen's counsel impeached Halkias's testimony at trial that there were two separate shooters—one who shot Stahl and one who shot at Halkias—by demonstrating that, on the morning after the shooting, Halkias said that there was only one shooter and that the shooter was Nguyen. The testimony came in as the following colloquy between Halkias and Nguyen's counsel:

Q: And you're sure that [the person who shot Stahl is] not the same person that shot—that chased you?

A: I'm sure that that wasn't the same person.

Q: Do you remember talking to a detective in this case, Detective Hearn, on July 31st at the precinct?

A: I remember talking to some people at the precinct. I'm not sure.

.    .    .    .    .

Q: Do you remember telling that detective or that person that you talked to at the precinct that an Asian guy came out of the auto, that he was wearing a black shirt and black pants and was walking with his hands behind his back? Do you remember telling him that?

A: Yes.

Q: And do you remember telling him that he came to [Stahl] and pulled a black gun and shot him once? Do you remember telling him that?

A: Yes.

Q: And do you remember telling him that he pulled back the slide and [Stahl]

fell to the ground and then he shot him in the back?

A: Yes.

. . . . .

Q: Mr. Halkias, do you remember saying that this [same] person turned toward me and fired a shot, you ran to Fifth Avenue and started to go up Fifth Avenue, I heard a click, I ran in the street and ducked behind a car and heard another click, I ran into a Greek restaurant, I looked out the door and saw the male Asian standing outside for a few seconds? Do you remember telling that to Detective Hearn?

A: I think I told him, yes.

Q: That was the same person that you say shot your friend; is that right?

A: If that's what I told him.

. . . . .

Q: Mr. Halkias, the next day at the precinct did you tell Assistant District Attorney Paisner that it was the same person [Nguyen] that shot your friend that then chased and shot you or shot at you with a gun?

A: I thought it was the same person.

Q: My question is, did you tell that to A.D.A. Paisner?

A: I think so.

Tr. 330–35.

Against this backdrop, it becomes clear that the trial judge's refusal to permit petitioner's counsel to cross-examine Halkias about his inability to identify petitioner, and counsel's failure to elicit the fact that Halkias identified Nguyen as the shooter, could not reasonably be said to have affected the verdict. *See Justice v. Hoke,* 90 F.3d 43, 47 (2d Cir.1996). Indeed, petitioner's counsel was able to argue in his summation that "the man closest to this event, Mr. John Halkias, was unable to identify Mr. Phan as the shooter

that night two years ago, and here when he appears before you." Tr. 972.

Moreover, the argument that counsel was ineffective because he did not elicit the fact that Halkias had actually identified petitioner's co-defendant, Nguyen, at the pretrial lineup fails for the same reason; on cross-examination by Nguyen's counsel, Halkias admitted that, on the morning after the shooting, he said the same person who had shot Stahl had also chased and shot at him, and that this person was Nguyen. Tr. 330–35. This point was further stressed by Nguyen's attorney in her summation. She argued that "[Halkias] admitted on the stand after claiming that these were two separate people that he told the police that the same person [Nguyen] that shot … his friend, turned the gun on him and chased him." Tr. 1012–13.

Though Halkias did not explicitly state at trial that he identified petitioner's co-defendant at the pretrial lineup, the jury learned of Halkias's later-renounced belief that Nguyen, not petitioner, was the shooter, through (1) witnessing Halkias's in-court identification of Nguyen as the person who chased and shot at him, and (2) hearing Halkias admit that, shortly after the incident, he told a police detective and an assistant district attorney that the same person who chased him had also shot Stahl. Accordingly, trial counsel's failure to attempt to elicit from Halkias that he had identified Nguyen as the shooter does not create a reasonable probability that the outcome of the trial would have been different had he done so.

Moreover, it is arguable whether the representation of petitioner's counsel "fell below an objective standard of reasonableness." *United States v. Gordon,* 156 F.3d 376, 379 (2d Cir.1998). The Supreme Court stated in *Strickland v. Washington,*

466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. 2052. In this case, there may have existed a strategic reason for counsel's decision not to elicit from Halkias that he had identified Nguyen at the pretrial lineup. When Halkias viewed the lineup at which he identified Nguyen as the shooter of Stahl, he indicated initially that he recognized both Nguyen and petitioner, and then said that he recognized Nguyen as the shooter. Tr. 49 (Hearing, Nov. 28, 1989). The prosecutor would likely have elicited this testimony had petitioner's counsel questioned Halkias about identifying Nguyen as the person who shot Stahl. Faced with that possibility, petitioner's counsel may have considered that it was the wiser course to attempt to elicit only that Halkias had failed to identify petitioner as the shooter. In any event, the jury ultimately heard that Halkias identified Nguyen as the shooter (although not at a lineup) and it did not hear that Halkias initially said that the shooter was either petitioner or Nguyen.

## II. Exclusion of Grand Jury Testimony

Petitioner contends that the trial court's refusal to admit the grand jury testimony of two witnesses also deprived him of his right to present a defense. The first witness, Vuu Vinh, testified that he was in the pool hall on 70th Street and 5th Avenue on the night of the incident, July 30, 1998, and that he saw petitioner in the pool hall about ten or fifteen minutes after the shooting. Grand jury minutes, 10, 16–17 ("GJ"). Vinh identified petitioner from a photograph. GJ 7. The more critical witness, Phi Trung Tran, testified before the grand jury that he was present at the pool hall on the night of the incident. GJ 40. Tran observed six individuals who had been playing pool walk "fast" out of the pool hall. GJ 41. He then heard shots fired. Tran testified that, "Right at the time I heard the gunshot, [petitioner] was playing there," GJ 45, one table over from him. GJ 43–45. Tran was told that a Chinese guy "with a gun [had] shot someone down." GJ 44. At the grand jury proceeding Tran identified petitioner from a photograph. GJ 42.

By the time of trial, Tran could not be found and Vinh was dead. The trial judge conducted a hearing on October 23, 1990, before the trial began, to address the admissibility of their grand jury testimony. Both petitioner's counsel and Robert Ledee, the private investigator assigned in early October to assist in petitioner's defense, testified. Counsel testified that petitioner informed him at the end of September that Phi Tran had "left town and perhaps the country." Tr. 110. Counsel called Tran at his last known address several times, but received no answer. He also called the restaurant where Tran was employed and spoke with the manager, who indicated that Tran had left "months and months ago," and that he did not know Tran's whereabouts. Tr. 110.

Ledee testified that he began his attempts to locate Phi Tran on Friday, October 19. He had been involved in another trial until that date. Tr. 89. He testified that he visited three addresses on the same block of 43rd Street: Tran's last address, and the addresses of two of the other individuals arrested in the case, one of whom had a listing for "Tran" in the directory. Tr. 89–91. Ledee did not receive a response at any of these three locations. He then went to the local branch of the Post Office, where he was

given a listing for a "Tran" at the witness's last known address. Tr. 92. He was also given a change of address for two "Trans," one in Philadelphia and the other in Coney Island, but neither "Tran" had a first name of "Phi," the name of the proposed witness. Tr. 92.

Ledee went back to 43rd Street on Saturday, October 20, accompanied by petitioner's counsel. Tr. 92–93. They returned to the three addresses on 43rd Street that Ledee had visited the day before, in addition to petitioner's last address. They spoke with a resident of each address, but none of them knew Phi Tran, petitioner, or any of the other individuals involved in the case. They left business cards with these residents, and asked that they call counsel or Ledee if they found out any information. Tr. 92–94. Ledee and counsel proceeded to an address on Fort Hamilton Parkway, where they interviewed John Tony, an individual who was in the pool hall on the night of the incident and who was one of the five Asian men that were placed in the lineup conducted the morning after the incident. Tr. 94–95. John Tony denied knowing Phi Tran. Tr. 95.

They then proceeded to the Coney Island address which they had received from the Post Office, and spoke to an individual named Y. Tran who informed them that he was Phi Tran's brother and that he lived there with his mother. Tr. 96. They explained to Y. Tran, as they explained to all the people they interviewed, that "a man's life was at stake, he might go to jail for a long period of time for something he possibly did not do. We also indicated that his brother would be in no trouble whatsoever, he had testified before, and he knew—he should know the attorney, Mr. Crossin." Tr. 106. Y. Tran informed them that he did not keep in touch with his brother or know his whereabouts, except to the extent

that he heard that his brother was working out-of-state, and believed that he may be working somewhere in Pennsylvania. Tr. 96. He did not recognize the Philadelphia address that had been provided by the Post Office. Tr. 103. Y. Tran indicated that Phi Tran was one of a set of twins, but that he did not know the twin brother's whereabouts either. Tr. 105. He also told Ledee and counsel that his brother came back to Brooklyn infrequently, to visit his mother, and that his mother might know where to locate Phi Tran, but that he did not know when she would return. Tr. 96. He indicated that he would ask his mother if she knew Phi Tran's whereabouts, and then contact Ledee and counsel. Tr. 96. They left business cards with Y. Tran. Tr. 97.

After speaking with Y. Tran, counsel returned to his office and made a series of phone calls. Counsel called the Coney Island address at 1:30 P.M. and at 6:00 P.M. He spoke with Y. Tran, who indicated that his mother had not yet returned, but that he had their phone numbers and would inform his mother when she returned. Tr. 110–11. He did not speak with anyone when he called again between 9:30 and 10:00 P.M. Tr. 111. Counsel also called Philadelphia telephone information, and was informed that no one named "Tran" had a telephone number listed at the Philadelphia address he had received from the Post Office, but that there was a listing for a "Tran" on the same street. Tr. 112–13. He called that number, which belonged to a production company, and left a message on the answering machine. Tr. 113.

On Sunday, October 21, counsel again called the Coney Island address between 12:00 and 1:00 P.M. Y. Tran informed counsel that he had relayed counsel's message to his mother, and that she would attempt to contact Phi Tran and then contact counsel if she contacted her son. Tr.

111. Counsel called again on Sunday night and on Monday morning. Tr. 111–12. On Monday, counsel spoke with a woman who informed him that Tran's mother was at work, and gave counsel a number where Tran's mother could be reached. Tr. 112. This work number was the same as the one that counsel had in his files for the restaurant where Tran had previously been employed. Tr. 116–17. Counsel called the restaurant and spoke with an individual who identified himself as the manager. Tr. 112. The manager indicated that Tran's mother was not in the restaurant, but that he had counsel's number and would give her the message. Tr. 112. At 5:30 P.M. on Monday, counsel sent a Western Union telegram to the Philadelphia address provided by the Post Office. Tr. 112.

Counsel argued at the hearing that "it appears that the family [of Phi Tran] is fully apprised that we're looking for Phi Tran, and based on their non-responsiveness I have to assume that they're not going to let us know any time soon, if at all, of where he is." Tr. 120–21. Counsel indicated that he would send Ledee to Chinatown, but that he could not provide Ledee with a picture of Phi Tran because neither he nor the police possessed one. Tr. 121–22. The Assistant District Attorney stressed that counsel and Ledee had not spoken to the mother, and that a possibility existed that they could ascertain Phi Tran's location if they did so. Tr. 122–23. After the trial judge indicated that the defense had not made a "true diligent effort," counsel requested that the judge reserve his final decision until he pursued additional channels, namely, a personal interview with the manager and/or mother. Tr. 124. The trial judge then suggested that the mother be subpoenaed, so that "a determination [can be] made right here in court where she's under oath to determine whether she has any knowledge of where

the son's located. . . ." Tr. 124. Subpoenas were signed by him on October 23 "requiring Mrs. Luu [Tran's mother] to appear in this Court and testify under oath." *People v. Phan*, 150 Misc.2d 435, 441, 568 N.Y.S.2d 498 (N.Y.Sup.Ct.1990). The subpoenas were served on Tran's mother at the restaurant where she worked. Tr. 936–37. Tran's mother did not appear to testify. *Phan*, 150 Misc.2d at 441, 568 N.Y.S.2d 498.

At the close of the prosecution's case, counsel stated that the defense "will be unable to offer any additional evidence on the issue of due diligence for the purpose of finding the witness we allege to be unavailable, Mr. Phi Tran." Tr. 928. When asked by the trial judge whether he or Ledee had yet interviewed Tran's mother at the restaurant, counsel responded that they had not, and that he could not "give the Court a reason aside from we were hoping that she would respond to the subpoena." Tr. 937.

The trial judge denied petitioner's application to introduce Tran's grand jury testimony, as well as the testimony of another witness, Vinh, who told the grand jury that he saw petitioner inside the pool hall 15 minutes after the shooting. He first concluded that the testimony of Vinh, who was deceased at the time of trial, was not material to the defense case because it did not create a reasonable doubt that did not otherwise exist. *Phan*, 150 Misc.2d at 439, 568 N.Y.S.2d 498. With respect to Phi Tran, the judge found that "while defendant has made attempts to find the witness Phi Trung Tran, his efforts have not met the good faith/due diligence standard necessary for a finding that the witness is unavailable." *Id.* at 441, 568 N.Y.S.2d 498. The specific deficiency that the judge identified was that petitioner "did not make efforts to physically interview Mrs. Luu and the restaurant manager, nor did he

conduct a more extensive interview of Y. Tran with respect to whether other relatives might know the whereabouts of Phi Trung Tran." *Id.* The trial judge observed that while he had "signed subpoenas on October 23 requiring Mrs. Luu to appear in this Court and testify under oath, she has not appeared. In fact, defense counsel had the subpoenas served on Mrs. Luu at the Manhattan Chinese restaurant, but neither defense counsel nor the investigator made any efforts to personally interview her at that location. The extent of the investigation, consisting of ringing doorbells, visiting one relative of the witness, and telephone calls, does not satisfy this Court that the witness is unavailable." *Id.*

In affirming the judgment of conviction, the Appellate Division addressed as follows the claim that it was error to exclude Tran's grand jury testimony:

A defendant has a constitutional right to introduce secondary evidence when (1) the evidence bears sufficient indicia of reliability, and (2) the witness is no longer available (*see, Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597; *Rosario v. Kuhlman,* 839 F.2d 918). With respect to one of the witnesses in question, the defendant failed to meet his burden of establishing that he made a good faith effort to obtain that witness's presence at trial (*see, Ohio v. Roberts, supra,* at 74, 100 S.Ct. 2531; *Rosario v. Kuhlman, supra,* at 924–925).

*People v. Phan,* 208 A.D.2d 659, 660–61, 617 N.Y.S.2d 480 (2d Dep't 1994).

■ Before addressing petitioner's challenge to this specific basis for excluding the grand jury testimony, I address the preliminary issues relating to the admissibility of the prior testimony and the showing of materiality necessary to grant relief. There is no dispute here that the grand jury testimony of Tran was under oath and subject to examination by a prosecutor who had a motive and opportunity to discredit his testimony. Indeed, after examining the grand jury testimony of Tran, the trial judge found that Phan "was subjected to a full and extensive cross-examination by the district attorney, the same party which would have had the opportunity to cross-examine the witness if he testified at the trial." *People v. Phan,* 150 Misc.2d 435, 439, 568 N.Y.S.2d 498 (N.Y.Sup.Ct.1990). This is sufficient to satisfy the reliability predicate for the admission of prior testimony. *Rosario v. Kuhlman,* 839 F.2d 918, 924 (2d Cir.1988).

Nor is there any dispute that the testimony was material. The standard for determining whether the exclusion of evidence is so unfairly prejudicial as to violate the Due Process Clause is the same one that the Supreme Court has applied to determine whether a defendant is entitled to a new trial when exculpatory evidence has been withheld. *See Collins v. Scully,* 755 F.2d 16, 18–19 (2d Cir.1985); *Justice v. Hoke,* 90 F.3d 43, 47 (2d Cir.1996). It was recently articulated by the Supreme Court in *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), in which the Court considered the defendant's claim that evidence favorable to him had been wrongfully withheld:

[The] touchstone ... is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Id.* at 434, 115 S.Ct. 1555. Because this standard necessarily subsumes the normal harmless error standard, once it has been met, the exclusion or non-disclosure of evi-

dence "cannot subsequently be found harmless under [*Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) ]." *Id.* at 436, 115 S.Ct. 1555.

■ The standard has been met here. The case against petitioner rested on the testimony of a single eyewitness to whom petitioner was a stranger. This kind of testimony is notoriously unreliable, and is alone sufficient to undermine confidence in the verdict. *See Arizona v. Youngblood,* 488 U.S. 51, 72 n. 8, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (Blackmun, J., dissenting, citing "authorities suggest[ing] that eyewitness testimony alone, in the absence of corroboration, is to be viewed with some suspicion"); *Jackson v. Fogg,* 589 F.2d 108, 112 (2d Cir.1978) (noting that of "all the various kinds of evidence" testimony of eyewitnesses "is the least reliable, especially where unsupported by corroborating evidence"); *see also Lyons v. Johnson,* 99 F.3d 499, 504 (2d Cir.1996) (noting that "eyewitness testimony is often highly inaccurate"). More recently, a study of 28 cases conducted by the National Institute of Justice in which convicted defendants were exonerated on the basis of DNA testing showed that the most common cause of conviction was eyewitness identification. Edward Connors, et al, *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial,* National Institute of Justice Research Report (June 1996). Indeed, Judge Newman has argued that an uncorroborated eyewitness identification should be held to be insufficient to sustain a conviction. See Jon O. Newman, The Madison Lecture: *Beyond "Reasonable Doubt",* 68 N.Y.U. L.Rev. 979, 999 (1993).

In addition to the "intrinsic unreliability of eyewitness identifications," *Lyons,* 99 F.3d at 504 (citations omitted), the identifi-cation here was a cross-racial one. Studies show that such identifications "are much less likely to be accurate than same race identifications." *Arizona v. Youngblood,* 488 U.S. at 72 n. 8, 109 S.Ct. 333 (internal quotations and citations omitted). Moreover, in a post-arrest lineup, a second eyewitness to the shooting identified petitioner's co-defendant as the person who shot Stahl. Under these circumstances, testimony by a witness placing petitioner inside the pool hall at the time of the shooting is plainly material. If credited by the jury, it "could have raised a reasonable doubt regarding the [accuracy of the eyewitness identification]." *Justice v. Hoke,* 90 F.3d 43, 50 (2d Cir.1996).

Indeed, the trial judge expressly found that Tran's testimony "potentially provides defendant with an alibi defense" and was material to his defense. *People v. Phan,* 150 Misc.2d 435, 439, 568 N.Y.S.2d 498 (N.Y.Sup.Ct.1990). The Appellate Division did not decide otherwise and the Assistant District Attorney acknowledges its significance here. Tr. 35 (Hearing, December 21, 2000) ("[T]he second witness said he was standing at the table [next] to him when these shots were fired. It's significant evidence."). The concession here is consistent with the position taken by the Assistant District Attorney at trial. Specifically, he told the trial judge that "to be candid, I was seriously considering consenting to defendant's application, because there is certainly a basis for it. . . ." Tr. 65. The objection to the admissibility of Tran's grand jury testimony, in the end, was motivated by the possible unavailability of a witness who would have contradicted one aspect of Tran's testimony, Tr. 65, a problem that the prosecutor would have faced even if Tran was available.

I turn then to the only issue on which the petition turns, namely, whether Tran was unavailable. Petitioner's 18–B counsel

and an investigator, whose fee was capped at $ 350 for the entire trial, Tr. 89 (Hearing, October 18, 1990), made serious efforts to locate Tran and to speak with his mother. Of course, as the Supreme Court observed in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), "[o]ne, in hindsight, may always think of other things [that could have been done to locate the witness]." *Id.* at 75, 100 S.Ct. 2531. The record there is instructive. Approximately four months before the defendant's trial and some ten months after the preliminary hearing testimony of Anita Issacs, a critical witness, the prosecutor contacted her mother about Anita's whereabouts. Mrs. Isaacs told him that Anita left her home in Ohio, for Tucson, Arizona, soon after the preliminary hearing. About a year before the trial, a San Francisco social worker was in communication with the Isaacs about a welfare application Anita had filed there. On the same day that Mrs. Isaacs spoke to the social worker, she also spoke to her daughter. *Id.* at 81, 100 S.Ct. 2531 ( Brennan, J., dissenting). Since then, however, Anita had called her parents only one other time and had not been in touch with her two sisters. When Anita called, some seven or eight months before trial, she told her parents that she "was traveling" outside Ohio, but did not reveal the place from which she called. Mrs. Isaacs stated that she knew of no way to reach Anita in case of an emergency. *Id.* at 75, 100 S.Ct. 2531.

Other than serving subpoenas on Anita Issacs at her parents home, the prosecution took no steps to find her such as contacting the San Francisco social worker with whom Mrs. Issacs had previously spoken and through whom Mrs. Issacs had apparently been able to contact her daughter a year earlier. Indeed, the dissenting Justices in *Roberts*, outlined "the vista of investigatory opportunities that were available to the State had it actually attempted

to find her." *Id.* at 82, 100 S.Ct. 2531. Nevertheless, the majority in *Roberts* concluded that "the great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." *Id.* at 76, 100 S.Ct. 2531.

■ This language is equally applicable here. In the present case, the mother of the witness is the analog of the social worker in *Roberts*. She was, as petitioner's interview of Tran's brother revealed, the only potential source of information as to Tran's whereabouts. Unlike the prosecutors in *Ohio v. Roberts*, who sought to use Anita Issacs' preliminary hearing testimony at trial, petitioner and his investigator made repeated efforts to contact Tran's mother, and they made far more substantial efforts to locate Tran than the State of Ohio did to locate Anita Issacs. Indeed, it was their own investigative efforts that led them to Tran's mother as a possible source of knowledge of his whereabouts. More significantly, even if the meager resources available to the defense could have been stretched to accommodate a greater effort, it seems unlikely, in light of the failure of Tran's mother to contact defense counsel or appear in response to the subpoena served upon her, that a face to face interview would have led to the discovery of Tran's whereabouts. Indeed, my own reading of the record supports the judgment of petitioner's counsel that, "it appears that the family [of Phi Tran] is fully apprised that we're looking for Phi Tran, and based on their non-responsiveness I have to assume that they're not going to let us know any time soon, if at all, of where he is." Tr. 120–21.

Moreover, the conclusion that the efforts of counsel were undertaken in good faith is

supported by the absence of any apparent motive to obtain an advantage by admitting secondary evidence. The New York Court of Appeals has observed that the purpose of requiring due diligence to secure the presence of a witness where prior testimony is being offered is to ensure that the failure to produce the witness "was not due to indifference or a strategic preference for presenting [the witness'] testimony in the more sheltered form ... of minutes rather in the confrontational setting of a personal appearance on the stand." *People v. Arroyo*, 54 N.Y.2d 567, 571, 446 N.Y.S.2d 910, 431 N.E.2d 271 (1982); *see also Rosario v. Kuhlman*, 839 F.2d 918, 925 (2d Cir.1988). There was no advantage to the petitioner to offer a transcript of Tran's grand jury testimony rather than having him testify before the jury. This was a case in which the prosecution had an eyewitness who identified the witness in open court. Such testimony, as a practical matter, is more likely to be overcome by the testimony of a live alibi witness, whose credibility the jury is able to assess, than the cold transcript of the prior testimony. Indeed, the Assistant District Attorney acknowledged as much in tempering his concession that Tran's grand jury testimony was significant. Tr. 35 (Hearing, December 21, 2000) ("I think whether this evidence would have a lot of impact coming in as a transcript, I don't know, but I think this was no[t] insignificant evidence").

■ There is one more reason why the exclusion of Tran's grand jury testimony was unreasonable, although I do not rely on it to grant the writ because it was not raised in the New York State courts. While I disagree with the holding of the trial judge that petitioner's lawyer failed to do enough to find Tran, if that holding is correct, then petitioner was deprived of the effective assistance of counsel. A lawyer competently representing his client has an obligation to use due diligence to secure the presence of an alibi witness whose testimony was critical to the defense case. Moreover, this particular dereliction of counsel was apparent to the trial judge in time to avoid the prejudice to the defendant, *i.e.* before he excluded Tran's grand jury testimony. Indeed, the trial judge apparently recognized his own obligation here to protect petitioner's rights when he suggested that Tran's mother be subpoenaed, although upon being informed that the subpoena had been served on her, he took no action to enforce it. Instead, as the following colloquy indicates, he appeared to be more concerned with making a record to justify the exclusion of Tran's grand jury testimony than in securing his presence:

THE COURT: I did sign a subpoena for the mother of one of those witnesses. What happened to that subpoena?

[DEFENSE COUNSEL]: It was served by Laurie Chinese Ramos.

THE COURT: Where was it served?

[DEFENSE COUNSEL]: On Canal Street, at the restaurant.

THE COURT: Did you or the—or your investigator go to that location, interview that person?

[DEFENSE COUNSEL]: No, your Honor.

THE COURT: Any reason for that?

．　　．　　．　　．　　．

[DEFENSE COUNSEL]: Well, I cannot give the Court a reason aside from we were hoping that she would respond to the subpoena.

THE COURT: All right. Thank you. That's what I wanted to know.

Tr. 936–37.

■ More was required. Where a trial judge is aware that counsel's dereliction threatens to prevent the defendant from introducing otherwise admissible evidence

central to his defense of innocence and misidentification, it is unreasonable to exclude the evidence without ensuring that defense counsel takes steps necessary to justify the admissibility of the evidence. At the very least, he should have taken steps to enforce the subpoena, and secure the compulsory attendance of Tran's mother.

The conclusion that it was error to have excluded the grand jury testimony of Tran does not end the discussion. The issue on which the admissibility of prior testimony turns—whether a witness is "unavailable"—is a mixed question of fact and law. *Rosario*, 839 F.2d at 923 n. 3. Prior to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), deference was due only to the findings of historical facts made by the state courts; the application of the law to the facts was subject to de novo review. *See Thompson v. Keohane*, 516 U.S. 99, 112–16, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995); *Cruz v. Miller*, 255 F.3d 77, 80 (2d Cir.2001). After AEDPA, deference is also due to legal determinations made by the state courts. Specifically, habeas corpus relief is not available unless the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1), amended by the AEDPA, Pub.L. No. 104–132, 110 Stat. 1214 (1996). The Supreme Court explained in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., writing for the Court), that a state court decision falls within the "unreasonable application" clause "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

The New York State courts here "identifie[d] the correct governing legal principle from [the Supreme Court's] decisions." *Id.* The Appellate Division, like the trial judge, acknowledged the "constitutional right [of a defendant] to introduce secondary evidence when (1) the evidence bears sufficient indicia of reliability, and (2) the witness is no longer available." *People v. Phan*, 208 A.D.2d 659, 660, 617 N.Y.S.2d 480 (2d Dep't 1994) (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597; *Rosario v. Kuhlman*, 839 F.2d 918 (2d Cir.1988)); *see also People v. Phan*, 150 Misc.2d 435, 438, 568 N.Y.S.2d 498 (N.Y.Sup.Ct.1990). The issue then is whether they "unreasonably applie[d] that principle to the facts of [petitioner's] case," *Williams*, 529 U.S. at 413, 120 S.Ct. 1495, in holding that petitioner had failed to make a good faith effort to obtain the testimony of Tran.

In *Williams*, Justice O'Connor observed that "[t]he term 'unreasonable' is ... difficult to define." *Id.* at 410, 120 S.Ct. 1495. In *Francis S. v. Stone*, 221 F.3d 100 (2d Cir.2000), Judge Newman held that the term encompasses "[s]ome increment of incorrectness beyond error." *Id.* at 111. He "caution[ed], however, that the increment need not be great; otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 889 (3d Cir.1999)). Even with this guidance, this case is difficult, because the issue is whether more could have been done—to which the answer is yes—and whether if more had been done, it would have succeeded in securing Tran's presence—to which the answer is unlikely. Since what is entailed here is a judgment call, a conclusion that it is "unreasonable," even as defined by Judge Newman, is a close one. Ultimately, the "increment of incorrectness beyond error" necessary to

grant the writ is to be found in the failure of the trial judge to assess the likelihood that, even if Tran's mother had been interviewed, it would have led to Tran's appearance at trial. She ignored a subpoena that was served on her, and it is reasonably inferrable that she was also told by her son Y. Tran and the manager of the restaurant of petitioner's efforts to locate her. On this record, it seems exceedingly unlikely that an interview with her would have led to the location of Tran and his testimony at trial. The trial judge here did not find otherwise. Indeed, although citing *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), he completely overlooked the ultimate basis that the Supreme Court gave for rejecting the argument that additional efforts to locate the missing witness should have been made. Specifically, that the "great improbability that such efforts would have resulted in locating the witness, and would have led to her production at trial, neutralizes any intimation that a concept of reasonableness required their execution." *Roberts,* 448 U.S. at 76, 100 S.Ct. 2531.

Judge Oakes, writing for the Second Circuit, observed that "the issue of misidentification is absolutely fundamental to a criminal trial," and that "[e]vidence which directly and strongly supports the possibility that a criminal defendant was misidentified certainly raises the specter of a reasonable doubt." *Lyons v. Johnson,* 99 F.3d 499, 504 (2d Cir.1996). The case against petitioner rested on the testimony of a single eyewitness. This kind of testimony, as I have already noted, has always been viewed with suspicion and as the source of unjust convictions. The excluded testimony here would have contradicted the eyewitness testimony and demonstrated petitioner's innocence if credited by the jury. Where, as here, petitioner made serious efforts to locate such a witness, it goes beyond mere error to exclude that testimony because of a speculative assumption that, if petitioner had done more, the witness would have been found.

## CONCLUSION

I conclude that petitioner's counsel made a good faith effort to locate the witness whose prior testimony he sought to introduce and that the holding that those efforts were insufficient was unreasonable. If those efforts were not sufficient, as the New York State courts found, petitioner was deprived of the effective assistance of counsel. I cannot grant the petition on the latter ground because it was not argued in the New York State courts. Nor am I persuaded that the exclusion of Vinh's grand jury testimony justifies setting aside the conviction. The remaining claims asserted by petitioner in his pro se petition, which are not pressed by counsel, are also without merit.

Petitioner has advised me that he does not wish to delay the issuance of the writ in order to further exhaust his state remedies with respect to the issue of the adequacy of counsel. Accordingly, this ground for relief is deemed to be withdrawn, and the petition for a writ of habeas corpus is granted on the ground that the exclusion of Tran's grand jury testimony deprived petitioner of his right to present a defense. Respondent is directed to release petitioner from the custody resulting from the judgment of conviction. The custodial status of petitioner after the judgment here becomes final is to be determined by the New York courts in accordance with the rules applicable to the detention of those awaiting retrial. The judgment is stayed pending appeal on the condition that the District Attorney file a notice of appeal and an application for an accelerated briefing and hearing of the

appeal within seven (7) days from the date the judgment is entered.

**SO ORDERED.**